# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Span*, 2011 IL App (1st) 083037

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SAMUEL SPAN, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1–08–3037 |
| Filed | June 30, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's convictions for attempted armed robbery and aggravated battery arising from the attempted robbery of a convenience store, his conviction and sentence for aggravated battery were affirmed, but his conviction and sentence for attempted armed robbery were vacated and the cause was remanded for sentencing based on the offense of attempted armed violence, since the evidence proved beyond a reasonable doubt that defendant was properly convicted of both attempted armed robbery and aggravated battery, but his sentence for attempted armed robbery violated the proportionate penalties clause because the sentence was harsher than the sentence that could have been imposed for attempted armed violence, an offense with identical elements; therefore, where the violation of the proportionate penalties clause was not the result of an amendment to the statute, the proper remedy was to vacate the conviction and sentence for attempted armed robbery and remand for sentencing on attempted armed violence. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06–12551; the Hon. John J. Scotillo, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed in part and vacated in part; cause remanded with directions. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Jonathan Yeasting, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Miles J. Keleher, and Tracey Annen, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE HALL delivered the judgment of the court, with opinion. |
| | Justices Lampkin and Rochford concurred in the judgment and opinion. |

**OPINION**

¶ 1   Following a bench trial, the defendant, Samuel Span, was found guilty of attempted armed robbery and aggravated battery. The trial court denied the defendant's motion for a new trial and imposed concurrent prison sentences of 25 years on the attempted armed robbery conviction and 5 years on the aggravated battery conviction. After the court denied his motion for reconsideration of his sentences, the defendant filed this appeal.

¶ 2   The following issues are raised on appeal: (1) whether the identification evidence was sufficient to prove beyond a reasonable doubt that the defendant was the assailant seen in the surveillance video; (2) whether the defendant was denied his right to self-representation; (3) whether the trial court erred in admitting the Lays potato chip bag into evidence; (4) whether the defendant's 25-year sentence for attempted armed robbery violated the Illinois Constitution's proportionate penalties clause; (5) whether the case should be remanded for a hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984); (6) whether the defendant's conviction for aggravated battery must be vacated; and (7) whether certain fees and fines should be vacated.

¶ 3   The defendant was charged by indictment with one count of attempted murder, two counts of attempted armed robbery, two counts of robbery and four counts of aggravated battery. The following is a summary of the pertinent trial evidence.

¶ 4   Through an interpreter, Valmik Gandhi testified that, on April 19, 2006, he worked as a cashier during the 10 p.m. to 8 a.m. shift at the 7-Eleven store located at 957 Summit Avenue in Elgin. At approximately 11:55 p.m. on that date, he was working alone when a man entered the 7-Eleven. The man told Mr. Gandhi that he wanted liquor. Mr. Gandhi walked over to the liquor area and stood with his back to the man. Mr. Gandhi then felt a blow to the back of his head, which caused him to fall to the floor. When he tried to get up,

he was struck on the face. While Mr. Gandhi was uncertain of what was used to strike him, he testified that it could have been the man's hand. Despite the second blow, he was able to reach up and push the emergency button under the counter. After an unsuccessful attempt to open the cash register, the assailant struck Mr. Gandhi again and left the store. Mr. Gandhi did not see the assailant take anything. He was unable to provide a description of the assailant to the police.

¶ 5    Mr. Gandhi explained that there were two store surveillance cameras working on April 19, 2006; one camera showed the entrance to the 7-Eleven, and the other showed the counter area. Prior to trial, Mr. Gandhi viewed the surveillance video. He testified that he recognized himself on the video and that the video recording was a true and accurate showing of the events in the 7-Eleven on April 19, 2006. The surveillance video was admitted into evidence and viewed by the trial court. In the video, the assailant was seen leaning over in front of the counter. Mr. Gandhi confirmed that the potato chip rack was located in front of the counter.

¶ 6    Mr. Gandhi testified further that he was treated at the scene by paramedics and then taken to Sherman Hospital, where he remained for 10 days. He was then transferred to Alexian Brothers Hospital, where he remained for 1 1/2 months.

¶ 7    Elgin police officer Darren Monforti, an evidence technician, testified that at 2 a.m. on April 20, 2006, he arrived at the 7-Eleven to collect evidence. Several police officers were already at the scene when he arrived, including another evidence technician, Officer Ken Herman. Upon entering the 7-Eleven, Officer Monforti observed footprints leading from the store entrance to behind the counter where the cash register was located, a footprint on the glass front door, and blood on the floor and the counter. He also noticed a potato chip bag on the floor behind the counter. Several detectives were viewing the surveillance video. After watching the video, Officer Monforti determined that the potato chip bag had evidentiary value.

¶ 8    Officer Monforti also participated in the May 5, 2006, execution of a search warrant for the premises at 320 North Liberty in Elgin. The search located a pair of size 12, white Nike Air gym shoes.

¶ 9    Officer Monforti identified several photographs, two of which depicted the potato chip bag. In both photographs, a yellow Lays potato chip bag can be seen on top of a box located on the low shelf behind the counter. According to the officer, the photographs truly and accurately depicted the scene at the 7-Eleven as he viewed it on April 20, 2006. Officer Monforti identified envelopes and letters addressed to the defendant at the 320 North Liberty address.

¶ 10    On cross-examination, Officer Monforti was questioned as follows:

"Q. And it's your testimony that at some point after you arrived, you noticed laying [*sic*] on the floor a Lay's [*sic*] potato chip bag, correct?

A. No. I was advised about it.

Q. Okay. Who advised you of this?

A. I don't remember who advised me, but it was learned through watching the video that the potato chip bag was dropped.

Q. The potato chip bag itself was laying [*sic*] on the floor at the time?

A. I believe so, yes."

¶ 11        Officer Monforti explained that Officer Herman took the photographs of the potato chip bag. Officer Monforti was not present when the potato chip bag was collected as evidence.

¶ 12        On redirect examination, Officer Monforti testified that the other officers pointed out the potato chip bag to him. They informed him that the bag had been found in that exact location and had not been handled prior to his arrival.

¶ 13        Sergeant Daniel O'Shea testified that he participated in the investigation of the April 19, 2006, incident at the 7-Eleven. While at the 7-Eleven, the sergeant and other officers watched the store surveillance video. While viewing the surveillance video, Sergeant O'Shea believed he recognized the assailant to be the defendant, whom he knew from prior police contacts. The sergeant made an in-court identification of the defendant as the assailant on the surveillance video.

¶ 14        Sergeant O'Shea described his observations from the surveillance video that aided in the investigation of this case. The assailant stood in front of a potato chip vending display. He picked up what appeared to be a yellow and white bag of potato chips and then proceeded to take what appeared to be a pipe wrench from his right front pocket. It appeared that the potato chip bag was dropped as the assailant ran behind the counter to where the clerk (Mr. Gandhi) was standing.

¶ 15        Sergeant O'Shea testified further that a potato chip bag was found in the location of the store where it appeared from the surveillance video to have been thrown by the assailant. The potato chip bag was photographed and collected as evidence. Fingerprints were lifted from the potato chip bag and sent to the State Police lab for analysis, along with a copy of the defendant's fingerprints that were already on file. Based on the report from the lab, Sergeant O'Shea obtained a warrant for the defendant's arrest. The defendant's fingerprints from his arrest in the present case were also sent to the lab for comparison.

¶ 16        On cross-examination, Sergeant O'Shea testified that, after viewing the surveillance video, Detective St. John and he located the potato chip bag where, from the video, it appeared to have been dropped. The sergeant instructed Officer Herman to photograph and collect the potato chip bag as evidence.

¶ 17        The parties stipulated that, if called as a witness, Patrick Powers, a specialist in fingerprint and footwear identification, would testify that he compared two latent prints on the Lays potato chip bag and the earlier set of defendant's fingerprints. He determined that one of the latent prints on the potato chip bag belonged to the defendant. He would further testify that a comparison between the two latent prints and the defendant's fingerprints taken after his arrest in this case revealed that both latent prints on the potato chip bag belonged to the defendant. Finally, Mr. Powers would testify that the footwear impressions taken from the 7-Eleven displayed a similar "outsole" pattern, size and design as the Nike Air shoes taken from the defendant's residence. However, he was unable to make a positive identification or elimination of shoe print evidence. After the admission of the State's exhibits into evidence, the State rested.

¶ 18    The defendant moved for a directed finding. The trial court granted the motion as to the attempted murder charge but denied it as to the other charges. After the defendant informed the court that he did not wish to testify, the defense rested its case.

¶ 19    The trial court found the defendant guilty of attempted armed robbery and aggravated battery. In explaining its ruling, the court noted that it gave little weight to the footprint evidence, citing the lack of evidence as to the size of the shoe recovered and the size of the footprint from the 7-Eleven. As to the other charges, the court noted Officer O'Shea's recognition of the defendant on the surveillance video, the officers' testimony as to the discovery of the potato chip bag and that testing revealed the presence of the defendant's fingerprints on the potato chip bag.

¶ 20    The court rejected the defendant's contention that the assailant had nothing in his hand when he beat Mr. Gandhi. The court was uncertain as to the actual object with which the assailant struck Mr. Gandhi. The video showed clearly that it was a bludgeon of some kind and not a fist. The court found that Sergeant O'Shea's testimony and the surveillance video together established that the defendant was the assailant.

¶ 21    The defendant's motion for a new trial was denied. Based on his previous felony convictions, the defendant was eligible for extended-term sentencing. The trial court imposed a 25-year sentence on the attempted armed robbery conviction and a 5-year sentence on the aggravated battery conviction, the sentences to run currently. Following the denial of his motion to reconsider sentence, the defendant filed a timely notice of appeal.

¶ 22                                    ANALYSIS

¶ 23                    I. Sufficiency of the Identification Evidence

¶ 24    The defendant contends that the evidence was insufficient to prove beyond a reasonable doubt that he was the assailant seen in the surveillance video. He maintains that the police officers' testimony exaggerated what the video showed.

¶ 25                            A. *Standard of Review*

¶ 26    The fact that the surveillance video shown at trial is available for this court to view raises a question as to the proper standard of review. The defendant reasons that less deference should be given to the trial court's findings because this court is in the same position to review the surveillance video as the trial court. See *People v. Rivera*, 409 Ill. App. 3d 122, 139 (2011) (where the evidence does not involve credibility determinations or observations of demeanor, the deference afforded the trier of fact is logically less).

¶ 27    Our supreme court has held that where the evidence before the trial court consists solely of documentary evidence, a reviewing court is not bound by the trial court's findings and may review the evidence *de novo*. *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 453, 905 N.E.2d 747 (2009). Where, as here, live testimony had a role in resolving a disputed issue of fact, the rule in *Addison Insurance Co.* does not apply. *People v. Valle*, 405 Ill. App. 3d 46, 58, 939 N.E.2d 10 (2010). Therefore, the proper standard of review is the well-settled one

applicable to the issue of whether the evidence was sufficient for a finding of guilty beyond a reasonable doubt.

¶ 28 "When a court is faced with a challenge to the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Moore*, 375 Ill. App. 3d 234, 238, 873 N.E.2d 381 (2007). We apply this standard regardless of whether the evidence is direct or circumstantial. *Moore*, 375 Ill. App. 3d at 238. "The reviewing court will not substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses and will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Moore*, 375 Ill. App. 3d at 238.

¶ 29 B. *Discussion*

¶ 30 The defendant argues that the surveillance video failed to establish that the assailant left his fingerprints on the potato chip bag. After viewing the surveillance video, we disagree with the defendant.

¶ 31 As seen on the surveillance video, the assailant stopped in front of a display, which Mr. Gandhi testified was the potato chip display. The assailant then grabbed something in his right hand. While the defendant concedes that the assailant looked down as though he were holding something in his hand, he argues that all that could be seen was a light-colored blur near the assailant's right hand. The object did appear to be yellow, the same color as the Lays potato chip bag. The assailant then ran around the counter. While the video did not show the assailant discarding the potato chip bag, according to the testimony, the potato chip bag was found in the area behind the counter.

¶ 32 The defendant points out that the surveillance video showed the area behind the counter, but no potato chip bag was seen in that area. The defendant also points out that both Sergeant O'Shea and Officer Monforti testified that the potato chip bag was on the floor behind the counter, not on the shelf as seen in the photographs. The defendant surmises that, between the time of the offense and the time the potato chip bag was collected for evidence, an unknown person moved the potato chip bag from another location in the 7-Eleven to the low shelf on the wall behind the counter.

¶ 33 According to Sergeant O'Shea, he located the potato chip bag where it appeared on the surveillance video to have been discarded by the assailant. He then instructed Officer Herman to photograph and collect the potato chip bag as evidence. Officer Herman was not called to testify as to the location of the potato chip bag when he was asked to photograph it. In the absence of Officer Herman's testimony, it is mere conjecture to assume that the potato chip bag was moved prior to its discovery by Sergeant O'Shea.

¶ 34 Next, the defendant argues that the fingerprint evidence was unreliable because the examiner achieved different results with each test. According to the State, the first fingerprint comparison used a copy of the defendant's prior fingerprint card, whereas the second comparison used the defendant's actual fingerprint card from his arrest in this case. The

defendant then points out that, while he stipulated that the fingerprints on the potato chip bag were his, he did not stipulate that the potato chip bag recovered by the police was touched by the assailant.

¶ 35    Fingerprint evidence is circumstantial evidence. *People v. Gomez*, 215 Ill. App. 3d 208, 216, 574 N.E.2d 822 (1991). Where a conviction is based solely on circumstantial evidence, the fingerprints must satisfy both the physical and temporal proximity criteria: they must be found in the immediate vicinity of the crime and under such circumstances as they could only have been made at the time the crime occurred. *Gomez*, 215 Ill. App. 3d at 216.

¶ 36    In *Gomez*, the reviewing court held that the single fingerprint of the defendant found in the victim's kitchen was insufficient to establish beyond a reasonable doubt that the defendant was guilty of the victim's murder. The fingerprint evidence was not sufficiently corroborated by the other physical evidence, and there was evidence that the defendant had been in the victim's kitchen on previous occasions. *Gomez*, 215 Ill. App. 3d at 216, 219.

¶ 37    *Gomez* is distinguishable. Unlike in *Gomez*, the evidence in this case established that the defendant's fingerprints were found on a potato chip bag that was in the immediate vicinity of the attack on Mr. Gandhi. Unlike in *Gomez*, there was no evidence that the defendant had been in that 7-Eleven on a prior occasion, much less that he touched a particular bag of potato chips.

¶ 38    Next, the defendant argues that there was no description of the conditions under which Sergeant O'Shea viewed the defendant prior to the incident at the 7-Eleven. The sergeant's recognition of the defendant was based on "prior contacts" with the defendant. It may be reasonably inferred from that testimony that Sergeant O'Shea had more than a fleeting encounter with the defendant. Moreover, the sergeant was able to make an in-court identification of the defendant as the assailant.

¶ 39    Next, the defendant argues that the assailant's skin tone differed from his own skin tone and that he has tattoos, whereas no tattoos could be seen on the face of the assailant. We are prevented from reviewing this particular argument as the record on appeal does not contain a photograph of the defendant.

¶ 40    Finally, the defendant points out that the trial court found only a physical resemblance between the assailant and the defendant. Having made that observation, the trial court concluded that the evidence, which included the surveillance video, the testimony of the police officers, and the fingerprint evidence, was sufficient to find the defendant guilty beyond a reasonable doubt. Viewing the evidence as we must, in the light most favorable to the State, the evidence is not so unreasonable, so improbable, or so unsatisfactory as would justify a conclusion by this court that a reasonable doubt exists as to the defendant's guilt.

¶ 41    We conclude that the evidence proved the identification of the defendant as the assailant in the surveillance video beyond a reasonable doubt.

## II. Right to Self-Representation

¶ 43    The defendant contends that the trial court's denial of his request to represent himself violated his right to self-representation. The following facts taken from the record are

pertinent to our resolution of this issue.

¶ 44    On June 20, 2006, privately retained counsel appeared on behalf of the defendant. After the defendant rejected a plea offer, a jury trial was scheduled for February 13, 2007. On that date, the trial court granted defense counsel's request to have the defendant examined to determine his fitness to stand trial. After additional continuances, the case was scheduled for a jury trial on June 11, 2007.

¶ 45    On June 11, 2007, the defendant appeared with defense counsel. The defendant asked to address the court, stating as follows:

"THE DEFENDANT: Like I told my lawyer, Mr. Jazwiec, in the back, that from here on out I would like to proceed pro se.

THE COURT: I see. Okay, well, you know on the day of trial it's a little late for that.

THE DEFENDANT: Actually it's not. I have case law that provides–in the back–I can show that at any given time I can ask to proceed pro se myself.

THE COURT: Okay. Well, you'll have you [*sic*] go back and get your case law."

¶ 46    Following a recess, defense counsel acknowledged that the fitness examination had been completed but explained to the court that he still had a *bona fide* doubt as to the defendant's fitness to stand trial. The case was reassigned to Circuit Court Judge Kenneth J. Wadas for a fitness hearing. The record does not indicate that the defendant returned to the courtroom with his case law following the recess.

¶ 47    On June 27, 2007, defense counsel appeared before Judge Wadas. The defendant was not present. In explaining the case background to Judge Wadas, defense counsel mentioned that the defendant had made claims that he wanted to represent himself. Finding the fitness examination report to be "stale," Judge Wadas ordered a second fitness examination. By the September 18, 2007, court proceeding, the second fitness examination report was again deemed "stale," and Judge Wadas ordered a third fitness examination. The defendant was not present but, through defense counsel, he requested permission to use the law library.

¶ 48    The case was scheduled for a fitness hearing on October 31, 2007. On that date, the prosecutor informed Judge Wadas that defense counsel requested a date by agreement. The defendant questioned the need for these proceedings and wanted the case transferred back to the trial court. Judge Wadas explained that the fitness issue had to be resolved first. The defendant then stated as follows:

"We have been dealing with it since June. I have been coming back and forth here since June. Every time I come, it is lawyers. We have a written statement by the doctor. I feel that should be enough."

Judge Wadas noted that it was defense counsel who was absent. The defendant responded as follows:

"Judge, just to make the process go a little faster, I am really at the point of dismissing him as my counsel just to get back to my original courtroom in Rolling Meadows. There is no need for this to take this long. This is ridiculous, five months for one motion. I have been up for this fitness thing about seven times. This is crazy."

¶ 49    The fitness hearing was finally held on February 8, 2008. Following the hearing, Judge Wadas found the defendant fit to stand trial, and the case was transferred back to the trial court.

¶ 50    On February 20, 2008, the parties appeared before the trial court to set a trial date. When the court suggested continuing the case into April in order to determine the availability of the witnesses, the defendant interjected as follows:

> "I got something to say. It's been two years, Man.
>
> MR. JAZWIEC: Sam?
>
> THE DEFENDANT: I have been ready.
>
> MR. JAZWIEC: Sam? I am sorry your Honor."

The case was then continued to March 14, 2008, to set a trial date.

¶ 51    On March 14, 2008, the trial court suggested May 19, 2008, for trial. The following exchange then occurred:

> "THE DEFENDANT: Your Honor, I would like to speak.
>
> THE COURT: No, Mr. Span. You're represented by counsel."

After the attorneys agreed to the May 19, 2008, trial date, the defendant interjected:

> "I have been here two years without motion for discovery. We [are] not ready for trial."

Later, at the request of the trial court, the trial was reset for June 16, 2008.

¶ 52    On June 16, 2008, the parties appeared for trial. Defense counsel presented the defendant's signed jury waiver. The court explained a jury trial to the defendant and questioned him as to whether he wished to be tried by a jury or by a judge. The defendant responded, "Me and my lawyer agree to be tried by the judge today."

¶ 53    Following the trial court's denial of his motion to reduce sentence, the defendant stated that he wished to place certain matters on the record for purposes of his appeal. Pertinent to this issue, he stated as follows:

> "The only thing I wanted to say was that in 2006 when I came to this court, they rendered [*sic*] a fitness hearing. Before the fitness hearing, I asked the Court to proceed pro se; and the Court denied me that right, knowing I had the right to proceed pro se because I believed that I could have defended myself better. After the fitness hearing–it took 10 months for that–counsel never introduced nothing that was said during the fitness hearing that could have been used as mitigating factors. *** [W]hen they (the appellate court) review my previous court transcripts, they can see that I did request to proceed pro se two-and-a-half years ago, which was denied. I did request numerous times to address the Court to bring up discrepancies, which was denied."

¶ 54                           A. *Standard of Review*

¶ 55    In general, the court applies a *de novo* standard of review to determine if an individual's constitutional rights have been violated. *People v. Burns*, 209 Ill. 2d 551, 560, 809 N.E.2d

107 (2004). The determination as to whether the defendant made an intelligent waiver of his right to counsel and invoked his right of self-representation is reviewed for an abuse of discretion. *People v. Baez*, 241 Ill. 2d 44, 116, 946 N.E.2d 359 (2011). " 'An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court.' " *People v. Patrick*, 233 Ill. 2d 62, 68, 908 N.E.2d 1 (2009) (quoting *People v. Hall*, 195 Ill. 2d 1, 20, 743 N.E.2d 126 (2000)).

¶ 56                                    B. *Forfeiture*

¶ 57        The parties dispute whether this issue was properly preserved for review. Even if the issue is deemed forfeited, the defendant's request for plain-error review requires that we first determine whether error occurred. *People v. Hudson*, 228 Ill. 2d 181, 191, 886 N.E.2d 964 (2008).

¶ 58                                    C. *Discussion*

¶ 59        A defendant has a constitutional right to represent himself. *Faretta v. California*, 422 U.S. 806 (1975); *People v. Burton*, 184 Ill. 2d 1, 703 N.E.2d 49 (1998). A defendant wishing to represent himself must relinquish his right to counsel knowingly and intelligently, and his waiver of counsel must be clear and unequivocal, not ambiguous. *Baez*, 241 Ill. 2d at 115-16. "Courts must 'indulge in every reasonable presumption against waiver' of the right to counsel." *Burton*, 184 Ill. 2d at 23 (quoting *Brewer v. Williams*, 430 U.S. 387, 404 (1977)). The defendant must make an articulate and unmistakable demand to represent himself; otherwise, he waives his right to self-representation. *Baez*, 241 Ill. 2d at 116.

¶ 60        In order to determine if the defendant made an intelligent waiver of his right to counsel, we examine the particular facts and circumstances of the case before us, including the background, experience and conduct of the defendant. *Baez*, 241 Ill. 2d at 116. We must determine if the defendant truly wanted to represent himself and definitively invoked his right to self-representation. *Baez*, 241 Ill. 2d at 116. A defendant's decision to represent himself may not be rejected solely on the basis that the court believes the decision to be unwise. *Baez*, 241 Ill. 2d at 116-17.

¶ 61        Even if a defendant has given some indication that he wishes to represent himself, he may later acquiesce in representation by counsel by vacillating or abandoning an earlier request to proceed *pro se*. *Burton*, 184 Ill. 2d at 23. "A defendant may forfeit self-representation by remaining silent at critical junctures of the proceedings." *Burton*, 184 Ill. 2d at 24. We may look to the defendant's subsequent conduct following his request to represent himself. *Burton*, 184 Ill. 2d at 23-24.

¶ 62        The defendant maintains that he made a clear and unequivocal request to represent himself on June 11, 2007, the initial trial date. He further maintains that he renewed his request for self-representation on October 31, 2007, the date of the aborted fitness hearing. Finally, he points out that he was unable to raise the matter at other court appearances because the trial court would not allow him to speak. While the defendant did request to represent himself, his subsequent conduct clearly established that he abandoned that request.

-10-

¶ 63    After his initial request to proceed *pro se* at the June 11, 2007, court proceedings, the defendant failed to return to the courtroom with the authority he claimed supported his right to request self-representation even as late as the day of trial. On October 31, 2007, he raised the issue again in front of Judge Wadas. It is clear from his statement to Judge Wadas that the defendant wanted to proceed without defense counsel because he believed it would result in the case being transferred back to the trial court and that it would avoid further delays. It was not because he was desirous of actually representing himself.

¶ 64    The record reflects that the defendant was not permitted to speak at some of the court appearances. However, at the posttrial proceedings, the defendant's complaint that he was not permitted to address the court related to his attempt to bring other errors to the trial court's attention. Moreover, the defendant did interject comments at his court appearances. But after October 31, 2007, he made no mention of proceeding *pro se* at any of those appearances. Finally, we note that the defendant referred to defense counsel as "my attorney" at the time he waived his right to a jury trial.

¶ 65    In *People v. Fisher*, 407 Ill. App. 3d 585, 944 N.E.2d 485 (2011), the reviewing court held that the trial court erred when it denied the defendant his constitutional right to self-representation on the basis that the defendant was incapable of adequately representing himself. *Fisher*, 407 Ill. App. 3d at 591. The court also held that the defendant's apparent acquiescence to the trial court's determination did not erase his unequivocal request to represent himself. *Fisher*, 407 Ill. App. 3d at 591.

¶ 66    *Fisher* is distinguishable. In the present case, the defendant's request was not denied because he was ill-equipped to represent himself. Moreover, it was the defendant's subsequent conduct that leads us to conclude that he abandoned his request to represent himself.

¶ 67    We note that, in determining that the defendant had not abandoned his request to represent himself, *Fisher* relied on *Orazio v. Dugger*, 876 F.2d 1508 (11th Cir. 1989). *Orazio* held that where a defendant has invoked his right to self-representation, he is not required to continually renew the request once it is conclusively denied. *Orazio*, 876 F.2d at 1512.

¶ 68    In the present case, the trial court did not "conclusively" deny the defendant's motion to proceed *pro se*. Rather, after questioning the timeliness of the request, the court invited the defendant to return with legal authority to support his position. The defendant failed to do so. When the defendant did renew his request, it was only to avoid further delays, not because he desired to conduct his own defense. See *Baez*, 241 Ill. 2d at 119 (distinguishing *Orazio* where the defendant was not merely silent but affirmatively told the court he wished counsel to represent him).

¶ 69    We conclude that the defendant was not denied his constitutional right to self-representation. Deciding as we do, we need not address the State's arguments that a *bona fide doubt* existed as to the defendant's ability to intelligently waive his right to counsel or that the defendant's request was untimely.

¶ 70                    III. Admission of the Potato Chip Bag Into Evidence

¶ 71    The defendant contends that the trial court erred in admitting the potato chip bag into

evidence without a proper foundation. As a result, the trial court improperly relied on the fingerprint evidence taken from the potato chip bag in finding the defendant guilty.

¶ 72 The defendant's failure to object to the lack of foundation at the time the potato chip bag was admitted into evidence and his failure to raise the issue in his posttrial motion forfeits the issue on appeal. *People v. Woods*, 214 Ill. 2d 455, 470, 828 N.E.2d 247 (2005). The defendant maintains that the admission of the potato chip bag into evidence without a proper foundation constitutes plain error.

¶ 73 Under the plain-error doctrine, we may consider a forfeited error when either: "(1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 186-87, 830 N.E.2d 467 (2005). In conducting a plain-error analysis, the court determines, first, if error occurred. *Hudson*, 228 Ill. 2d at 191.

¶ 74 The defendant correctly notes that an adequate foundation must be laid before an object may be introduced into evidence. *Woods*, 214 Ill. 2d at 466. Where an item has readily identifiable and unique characteristics and its composition is not easily subject to change, an adequate foundation is laid by testimony that the item sought to be admitted is the same item recovered and that it is in substantially the same condition as when it was recovered. *Woods*, 214 Ill. 2d at 466. Where the defendant is accused of a narcotics violation, the physical evidence may not be readily identifiable and is susceptible to tampering. In such cases, the State must prove a chain of custody. *Woods*, 214 Ill. 2d at 466-67. Unlike *Woods*, this case does not involve narcotics.

¶ 75 The police officers' testimony established that the potato chip bag admitted into evidence was the same potato chip bag recovered from the 7-Eleven. Therefore, there was a proper foundation for the admission of the potato chip bag into evidence. As no error occurred, the defendant forfeited this issue.

¶ 76                    IV. Violation of the One-Act, One-Crime Doctrine

¶ 77 The defendant contends that his aggravated battery conviction must be vacated because it is based on the same act as his attempted armed robbery conviction.

¶ 78                              A. *Standard of Review*

¶ 79 The issue raised is purely one of law to which the *de novo* standard of review applies. *People v. Artis*, 232 Ill. 2d 156, 161, 902 N.E.2d 677 (2009).

¶ 80                                 B. *Forfeiture*

¶ 81 The defendant acknowledges that he failed to raise this issue in the trial court. However, a violation of the one-act, one-crime doctrine affects the integrity of the judicial process, thus satisfying the second prong of the plain-error analysis. See *People v. Harvey*, 211 Ill. 2d 368, 389, 813 N.E.2d 181 (2004).

¶ 82                                   C. *Discussion*

¶ 83      To determine whether a violation of the one-act, one-crime doctrine has occurred, the court performs a two-step analysis. *People v. Miller*, 238 Ill. 2d 161, 165, 938 N.E.2d 498 (2010). First, the court determines whether the defendant's conduct involved multiple acts or a single act. Multiple convictions are improper where they are based on precisely the same act. *Miller*, 238 Ill. 2d at 165. Second, if the conduct involved multiple acts, then the court must determine if any of the offenses are lesser-included offenses. If so, multiple convictions are improper. *Miller*, 238 Ill. 2d at 165. " '[W]hen more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser[-]included offenses, convictions with concurrent sentences can be entered.' " *Artis*, 232 Ill. 2d at 161 (quoting *People v. King*, 66 Ill. 2d 551, 566, 363 N.E.2d 838 (1977)).

¶ 84      The evidence in this case established that the defendant committed multiple acts. Mr. Gandhi testified that as he stood with his back to the defendant, he felt a blow to the back of his head, causing him to fall to the floor. As he tried to get up, he was struck on the face. As he left the 7-Eleven, the defendant struck Mr. Gandhi again. The infliction of the blows to Mr. Gandhi was interrupted by the defendant's attempt to break into the cash register. Therefore, the defendant's acts support both his conviction for attempted armed robbery and aggravated battery.

¶ 85      The defendant correctly points out that the counts in the indictment failed to differentiate between the blows to Mr. Gandhi supporting the attempted armed robbery charge and the blows supporting the aggravated battery charge. He maintains that pursuant to *People v. Crespo*, 203 Ill. 2d 335, 788 N.E.2d 1117 (2001), his conviction and sentence for aggravated battery must be vacated.

¶ 86      In *Crespo*, the defendant stabbed the victim three times and was convicted of armed violence and aggravated battery. While acknowledging that each of the wounds could support a separate offense, the supreme court reversed the defendant's aggravated battery conviction because the indictment failed to apportion the three acts of stabbing among the offenses, and the State did not argue the separate offenses theory to the jury. The court concluded that "to apportion the crimes among the various stab wounds for the first time on appeal would be profoundly unfair" to the defendant. *Crespo*, 203 Ill. 2d at 343.

¶ 87      Other factors distinguish the present case from *Crespo*. The main concern for the court in *Crespo* was that the State waited until the appeal to apportion the actions of the defendant to several crimes. *People v. Jimerson*, 404 Ill. App. 3d 621, 636, 936 N.E.2d 749 (2010). In the present case, the prosecutor, responding to the defendant's motion for a directed finding on the attempted murder charge, pointed out that as he fled from the 7-Eleven, the defendant struck Mr. Gandhi again. The prosecutor argued that, as the defendant was no longer trying to take the money, his only reason for striking Mr. Gandhi was to eliminate a witness. Therefore, in the present case, the State sought to apportion the defendant's acts among the separate charges in the trial court.

¶ 88      Moreover, unlike *Crespo*, this was a bench trial. The trial court heard Mr. Gandhi's testimony and viewed the surveillance video, which showed that the final blow the defendant inflicted on Mr. Gandhi was separated from the two prior blows by the intervening act of the

defendant's attempt to open the register. Unlike a jury, the experienced trial judge would have understood the need to consider whether there was sufficient evidence to conclude that the defendant's actions constituted separate offenses.

¶ 89 We conclude that the defendant's convictions for attempted armed robbery and aggravated battery were not based on the same physical act. We now turn to the question of whether aggravated battery is a lesser-included offense of attempted armed robbery. In *Miller*, the supreme court held that the abstract elements approach was the proper analysis to apply when determining whether one charged offense was a lesser-included offense of another charged offense for purposes of the one-act, one-crime doctrine. *Miller*, 238 Ill. 2d at 173-74 (rejecting the charging instruments approach where charged offenses are at issue). We compare the statutory elements of the charged offenses of attempted armed robbery and aggravated battery to determine whether "all of the elements of one offense are included within a second offense and the first offense contains no element not included in the second offense." *Miller*, 238 Ill. 2d at 166.

¶ 90 A person commits attempted armed robbery when he or she takes a substantial step toward "tak[ing] property *** from the person or presence of another by the use of force or by threatening the imminent use of force" and "he or she carries on or about his or her person or is otherwise armed with a dangerous weapon other than a firearm." 720 ILCS 5/18–1, 18–2(a)(1) (West 2006). A person commits aggravated battery when, in committing a battery, he "intentionally or knowingly causes great bodily harm, or permanent disability or disfigurement." 720 ILCS 5/12–4 (West 2006).

¶ 91 A comparison of the two offenses reveals that attempted armed robbery does not require the infliction of great bodily harm or permanent disability or disfigurement as does aggravated battery. Therefore, aggravated battery is not a lesser-included offense of attempted armed robbery.

¶ 92 We conclude that the defendant was properly convicted of both attempted armed robbery and aggravated battery.

¶ 93 V. Violation of Proportionate Penalties Clause

¶ 94 The defendant contends that his 25-year sentence for attempted armed robbery violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). He maintains that, while attempted armed robbery and attempted armed violence have identical elements, attempted armed robbery carries a more severe penalty.

¶ 95 A. *Standard of Review*

¶ 96 The issue of whether a sentencing provision violates the proportionate penalties clause is a matter of law, which we review *de novo*. *People v. Hauschild*, 226 Ill. 2d 63, 83, 871 N.E.2d 1 (2007).

¶ 97 B. *Discussion*

¶ 98 The proportionate penalties clause is violated where offenses with identical elements

-14-

carry different penalties. *People v. Sharpe*, 216 Ill. 2d 481, 487, 839 N.E.2d 492 (2005). Our supreme court has determined that the elements of the substantive offenses of armed robbery and armed violence predicated on robbery while armed with a category I or category II weapon were identical. *Hauschild*, 226 Ill. 2d at 86.

¶ 99 In *Hauschild*, the court observed that the armed violence statute excluded armed robbery but not robbery as a predicate felony. Since robberies could serve as predicate felonies for armed violence, the court reasoned that every charge of armed violence predicated on robbery would also be an armed robbery. *Hauschild*, 226 Ill. 2d at 85.

¶ 100 The State contends that the elements of attempted armed violence predicated on robbery, while armed with a category III weapon[1] and attempted armed robbery while armed with a weapon other than a firearm, are not identical because a conviction for attempted armed violence requires that the defendant complete the predicate offense of robbery. See *People v. Lucas*, 231 Ill. 2d 169, 897 N.E.2d 778 (2008) (to find a defendant guilty of armed violence the State must prove the predicate felony beyond a reasonable doubt). We disagree that an attempt to commit armed violence always requires the completion of the underlying felony as the substantial step. *People v. Wallace*, 57 Ill. 2d 285, 312 N.E.2d 263 (1974), is instructive on this point.

¶ 101 In *Wallace*, the defendants were convicted of attempted bribery. On appeal, they pointed out that the mere offering of the bribe completed the offense. As there was no requirement that the bribe be accepted, every substantial step toward the commission of the offense would result in the completed offense. The supreme court observed that there was a presumption that the attempt statute covered all offenses. The court further observed that what activity constituted a substantial step was dependent upon the facts of each case. The court determined that there "may exist factual situations in which the conduct of a defendant does not amount to the unlawful tender or promise of property to a public official under the bribery section *** yet such activity might be construed as a substantial step toward the completion of the offense." *Wallace*, 57 Ill. 2d at 292.

¶ 102 Attempted armed violence may be established by proving that the defendant committed the predicate felony while attempting to secure a dangerous weapon or by proving that the defendant attempted to commit the predicate offense while armed with a dangerous weapon. In the latter scenario, the defendant's actions fall short of completing the predicate offense. In this case, the substantial step was the defendant's attempt to commit a robbery while armed with a bludgeon.

¶ 103 *People v. Taylor*, 314 Ill. App. 3d 943, 733 N.E.2d 902 (2000), relied on by the State, does not persuade us otherwise. In *Taylor*, the issue before the reviewing court was whether it was possible to commit attempted armed violence. The court held that taking a substantial step toward committing armed violence would nearly always result in the completed offense of armed violence. However, that fact did not demonstrate a legislative intent to exclude

---

[1]For purposes of the armed violence statute, a person is armed with a dangerous weapon when he carries or is otherwise armed with a bludgeon, a category III weapon. See 720 ILCS 5/33A–1(c)(1), (c)(3) (West 2006).

armed violence from the attempt statute. *Taylor*, 314 Ill. App. 3d at 946. The court's holding in *Taylor* did not preclude the possibility that attempt armed violence could be committed without the completion of the predicate felony.

¶ 104    The State also cites *People v. Paden*, 123 Ill. App. 3d 514, 462 N.E.2d 989 (1984). In *Paden*, the defendant was found guilty of attempted robbery, attempted armed robbery and armed violence but was sentenced only on the armed violence conviction. On appeal, the court rejected her argument that her sentence violated the proportionate penalties clause because (at that time) attempted armed robbery carried a lesser penalty than armed violence. The court held that where the same physical act constituted two or more offenses, it was proper to enter a conviction and sentence on the most serious of the offenses. *Paden*, 123 Ill. App. 3d at 521. However, in *Hauschild*, the supreme court held that "it is impermissible to allow the constitutional prohibition against disproportionate penalties for identical crimes to be relaxed where the State decides to proceed only with the crime carrying [the] greater penalty." *Hauschild*, 226 Ill. 2d at 87.

¶ 105    We agree with the defendant that, as charged in this case, attempted armed robbery, committed with a bludgeon, and attempted armed violence, where the predicate felony is robbery while armed with a bludgeon, contain identical elements. We now must determine if the penalties for the two offenses impose disparate sentences.

¶ 106    Attempted armed robbery, committed with a bludgeon, is punished as a Class 1 felony for which the sentencing range is 4 to 15 years (730 ILCS 5/5–8–1(a)(4) (West 2006); 720 ILCS 5/8–4(c)(2) (West 2006)). Attempted armed violence, where the weapon is a bludgeon, is a Class 3 felony for which the sentencing range is two to five years. See 720 ILCS 5/8–4(c)(2) (West 2006); 730 ILCS 5/5–8–1(a)(6) (West 2006).

¶ 107    Based on the defendant's prior convictions, the trial court found that he was eligible for an extended-term sentence. See 730 ILCS 5/5–5–3.2(b)(1) (West 2006). The extended-term range for a Class 1 felony is 15 to 30 years (730 ILCS 5/5–8–2(a)(3) (West 2006)). On the attempted armed robbery conviction, the trial court imposed an extended-term sentence of 25 years. The extended-term sentence for a Class 3 felony is 5 to 10 years (730 ILCS 5/5–8–2(a)(5) (West 2006)). Had the defendant been sentenced for attempted armed violence, the maximum extended-term sentence that could have been imposed was 10 years.

¶ 108    We conclude that the penalties for attempted armed robbery in this case are unconstitutionally disproportionate. We now must determine the appropriate remedy.

¶ 109    Where a Class X felony and a Class 1 felony were found to have identical elements, the defendant's conviction and sentence for the class X offense was vacated, and the case was remanded for sentencing on the Class 1 felony. See *People v. Christy*, 188 Ill. App. 3d 330, 334, 544 N.E.2d 88 (1989), *aff'd*, 139 Ill. 2d 172, 564 N.E.2d 770 (1990). Where an amended sentencing statute violates the proportionate penalties clause, the proper remedy is to remand for resentencing on the conviction in accordance with the statute as it existed prior to the amendment. See *Hauschild*, 226 Ill. 2d at 88-89.

¶ 110    In this case, the violation of the proportionate penalties clause was not the result of an amendment to the statute. Therefore, we agree with the defendant that the remedy set forth in *Christy* applies. The defendant's conviction and sentence for attempted armed robbery

must be vacated and the case remanded for sentencing on the Class 3 felony of attempted armed violence.

¶ 111　　Our resolution of this issue does not change our analysis of the one-act, one-crime issue. We are not vacating the defendant's attempted armed robbery conviction because the defendant was not found guilty beyond a reasonable doubt of attempted armed robbery. The one-act, one-crime issue relates to the commission of the offense. In contrast, the proportionate penalties issue relates to the sentence.

¶ 112　　　　　　　　　　　VI. *Krankel* Hearing

¶ 113　　The defendant contends that the trial court erred when it failed to conduct a hearing into his posttrial *pro se* allegations of ineffective assistance of counsel. Relying on *Krankel*, 102 Ill. 2d 181, he requests that this court remand the case in order for the trial court to inquire into his allegations. According to his statement at the conclusion of his sentencing hearing, the defendant maintained that defense counsel was ineffective because he failed to present certain factors in mitigation. As the defendant's allegation may be remedied at his new sentencing hearing, we need not address the merits of this issue.

¶ 114　　　　　　　　VII. Improper Assessment of Fines and Fees

¶ 115　　As this case is remanded for a new sentencing hearing, we need not address the defendant's contentions relating to the imposition of fees, fines and credits.

¶ 116　　　　　　　　　　　　CONCLUSION

¶ 117　　The defendant's conviction and sentence for aggravated battery are affirmed. The defendant's conviction and sentence for attempted armed robbery are vacated. The cause is remanded to the trial court for sentencing based on the offense of attempted armed violence.

¶ 118　　Affirmed in part and vacated in part; cause remanded with directions.