2023 IL App (2d) 220179-U
No. 2-22-0179
Order filed February 17, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Nos. 20-CF-48 |
| | ) | 20-CM-48 |
| | ) | |
| JOSE M. AGUIRRE, | ) ) | Honorable Robert P. Pilmer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*: The evidence supported defendant's conviction of aggravated domestic battery based on strangulation.  At trial, the parties disagreed over the interpretation of defendant's statements in a squad-car video recorded on his way to the police station.  The trial court reasonably interpreted defendant's statements as a confession.  Also, there was evidence corroborating the confession.

¶ 2    After a bench trial, defendant, Jose M. Aguirre, was convicted of aggravated domestic battery (720 ILCS 5/12-3.3(a-5) (West 2020)) and sentenced to 30 months of probation and 70 days of periodic imprisonment.  On appeal, he contends that he was not proven guilty beyond a reasonable doubt.  We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The State brought a two-count indictment. Count I charged defendant with aggravated domestic battery (*id.*), alleging that, on January 31, 2020, he knowingly strangled J.N., a family member. Count II nominally charged defendant with aggravated domestic battery but cited the aggravated battery statute (*id.* § 3.05(a)(5)). The State acknowledged the discrepancy and dismissed count II before trial. The State also charged defendant by complaint with two misdemeanors (case No. 18-CM-48) based on the January 31, 2020, incident.

¶ 5      At trial, Yorkville police officer Kyle Davis testified that, on January 31, 2020, at approximately 1:42 a.m., he and officer Sean Enk were dispatched to an apartment in a high-rise. Sergeant Carlyle (first name not given) arrived separately. Initially, the three officers spoke with defendant outside the apartment. Davis and Carlyle then entered and spoke with J.N. She was upset and had dried blood on the left sleeve of her sweater. In addition, there was a slight redness on her neck. Davis saw dried blood on the bathroom wall and bedding in a bedroom. He photographed the sweater sleeve, J.N.'s neck, the bathroom wall, and the bedding. The photographs were admitted into evidence.

¶ 6      Davis testified on cross-examination that he went to the apartment in response to a stolen motor vehicle report. He heard no yelling or fighting as he approached the apartment. When asked if anyone other than J.N. and the officers were inside the apartment, Davis testified that there might have been a child sleeping in the bedroom, but no child came out of the bedroom while he was there. There was no blood on J.N.'s neck or collar. However, she showed signs of being under the influence of alcohol: an odor of alcohol came from her, and her eyes were bloodshot. Davis told Enk about his interview with J.N., and Enk arrested defendant.

¶ 7　Enk testified that, while speaking with defendant outside the apartment, he saw that the knuckles of defendant's right hand had abrasions and what appeared to be dried blood. Enk asked defendant about the injuries; defendant responded that he did not know how they got there. Enk arrested defendant and drove him to jail. During the ride, the audiovisual recording system in Enk's squad car recorded the backseat area where defendant was seated. At the jail, defendant complained of a swollen left ankle. Enk drove him to the hospital, where he was treated and released. Enk had not previously noticed anything wrong with defendant's ankle.

¶ 8　Enk identified a photograph of defendant's right hand, showing the injuries to the knuckles. Enk also identified a copy of the video from the squad car. Both items were admitted into evidence. The State published video excerpts from 2:45 to 3:29 and 5:30 to 5:50. The following exchange occurred between 2:45 to 3:39:

> "DEFENDANT: I mean, what am I being arrested for?
>
> ENK: For domestic battery.
>
> DEFENDANT: No. No, dude, how, uh—
>
> ENK: (inaudible)
>
> DEFENDANT: Dude, that is so f*** up. I didn't do anything—cause I was trying to get my keys, that's why she's bl—Dude, that is so f*** up. The cops are always going to believe a female over me. Nooo [cries]. Dude, I didn't do anything, I promise you."

Defendant stated at 5:30-5:50:

> "Everybody is always going to believe a f*** female over a male. [Short pause.] I know, I choked her because I got my blood on her f*** sweater cause I was tryin' to get my keys. [Short pause.] That's b***, dude, that's b***."

¶ 9     Enk testified on cross-examination that he was dispatched to the apartment to assist a citizen, based on a report that J.N. had taken defendant's car without permission. As he approached the apartment, he heard no yelling from inside. He met defendant outside the apartment. Enk kept defendant in his sight and never saw anyone harm him. In addition to the injuries to his right hand, defendant had an injury to the back of his head, which Enk did not specify. At the hospital, Enk photographed defendant's left ankle. He identified one of those photographs.

¶ 10    J.N. testified that she resided at the apartment with her 13-year-old daughter and 2-year-old son. By September 2019, defendant was also living there. On January 30, 2020, defendant was aware that J.N.'s driving privileges were revoked and she did not have her own car. J.N. did not have a set of keys to defendant's car, but she had borrowed the car several times from him. Defendant never told her not to drive his car, even though her license was revoked.

¶ 11    J.N. testified that, on January 30, 2020, she had plans to go to a party in Schaumburg. Defendant loaned her the car keys and, between 2 and 3 p.m., she drove to a friend's home to get her hair done for the party. While she was getting her hair done, defendant called her several times. During these calls, he never asked her to return the car or complained that she was driving it. After getting her hair done, J.N. went to a restaurant, then arrived alone at the party at about 8 p.m. Later, she drove home by herself and parked defendant's car in the apartment building's parking lot.

¶ 12    J.N. testified that her bedroom was on the right side of the unit. The kitchen was straight ahead, and the living room and dining room were on the left side. When she opened the apartment door and entered, defendant "had gotten in [her] face and was screaming." He called her a "whore" and said other things, which she could not recall. Soon, he pushed her to the ground; she fell in the direction of the bedroom. He then grabbed her by the throat. He was on top of her with both

hands around her neck. She was unable to breathe and tried to push him off. J.N. was unsure how long the pressure lasted but estimated about 10 seconds. When the police knocked on the door, defendant got off her and answered the door.

¶ 13   J.N. testified that she saw blood on the left sleeve of her sweater. The blood had not been there before she came home. On January 31, 2020, shortly after defendant was arrested, J.N. spoke with sheriff's detective Stoch (first name not given). J.N. spoke to Stoch again on February 14, 2020. J.N. admitted that her later account varied from the earlier one; she told Stoch on the later date that defendant did not strangle her but merely grabbed her by the throat. She changed her story because, on February 10, 2020, after defendant appeared in court, he came home and told her that an allegation of strangling would result in a felony charge. Because J.N. felt sorry for him, she lied to Stoch and said that defendant's conduct was not as serious as she had said on January 31, 2020.

¶ 14   J.N. testified on cross-examination as follows. Her daughter was at home with defendant the entire time she was away getting her hair done and attending the party. J.N. admitted that she had neither a valid driver's license nor insurance when she took defendant's car. She denied that she drank any alcohol while she was out. After the police arrested defendant, J.N. saw blood on a living room couch cushion, on the top of her bed comforter, and in the bathroom. She did not cut defendant. Asked whether defendant was cut during the incident, J.N. testified, "I do not know how he got cut."

¶ 15   J.N again recounted the sequence of events that occurred when she returned home. She testified that, as soon as she entered, defendant was screaming at her. Asked whether this happened "in the front area" of the residence, she testified, "Right when you walk in, yes." Although the incident did not happen in her bedroom as such, "[i]t happened where [her] bedroom [was]." She

did not recall the exact spot. She admitted that she told Stoch that the incident "happened in [her] bedroom[.]" However, she explained that "there is a hallway that's still considered [her] bedroom" and the incident occurred there.

¶ 16    J.N. denied that, on January 31, 2020, she had "an active alcohol problem[.]" When asked if her daughter woke up during the incident, J.N. testified, "She heard what was going on that night." (J.N. did not explain how she knew this.) When asked if she told Stoch that her daughter was asleep throughout the incident, she testified, "Yes, she was asleep during the incident, not before that."

¶ 17    J.N. testified that, while defendant was screaming at her, she tried to call the police. She dialed 911 and spoke with a person on the line. However, she had no recording of the call and did not "leave [the phone] open so they could hear the crime in commission[.]" She could not recall whether, after the police knocked on the door, defendant went anywhere in the apartment before he answered the door. She did not see him walk to either the bathroom or her bedroom, or sit on the living room couch. Her daughter did not participate in the interview with the police.

¶ 18    On redirect, J.N. identified a list of questions the officers asked her at the scene. One question was whether defendant ever strangled her; she answered yes. She told the officers that defendant placed both hands around her neck for about 15 seconds in a "choking manner" and that she could not breathe for that period. J.N. also identified two complaints that she signed on January 31, 2020. Both complaints stated that defendant put his hands around her neck and choked her. When Stoch arrived later that morning, J.N. also told her that defendant choked her with both hands for about 15 seconds and she had difficulty breathing during that time.

¶ 19    The State rested. The only evidence defendant introduced was the photograph Enk took of his left ankle at the hospital.

¶ 20    In its closing argument, the State contended that J.N. was credible.  In addition to her testimony, she stated numerous times to law enforcement that defendant choked her on the morning of January 31, 2020.  Further, the injuries to defendant's hand depicted in the photographs were consistent with J.N.'s account of a struggle, during which (the State contended) blood could have transferred to her sweater sleeve.  Also, the fact that defendant had injuries to his knuckles but not his palm explained how blood could have been transferred to the sweater sleeve (as she tried to push him off) but not to her neck or collar.  Also, defendant's ankle injury must have resulted from his taking her down to the floor; Enk's testimony and the photograph showed that the pain and swelling quickly worsened.

¶ 21    The State continued:

"MR. SHLIFKA [(ASSISTANT STATE'S ATTORNEY)]: And then we have the squad video, the defendant's confession in the back seat of Officer Enk's car where he says, I know I choked her because I had my blood on her f*** sweater because I was trying to get my f*** keys.

MR. GUILAMO [(DEFENSE ATTORNEY)]: Objection.  That's not what that says.

THE COURT: Well, the objection's overruled.

You can continue, Mr. Shlifka.

(The recording was played in open court.)

MR. SHLIFKA: You can listen to that as many times as you want.  The only thing that makes sense is, I know I choked her.  That's it.  That's this drunk man, not realizing he's confessing to the crime, and providing the best piece of evidence to this case."

¶ 22    The State continued that J.N. had nothing to gain by testifying against defendant except "justice" and that, despite her awkwardness at times, she testified calmly and responsively.

¶ 23    Defendant began his argument:

"Your Honor, [the State] plays the part of the drive to the jail which surprisingly would be the same part that the defense would play because that part is the explanation of what happened ***.  The defendant was trying to get his keys.  That is exactly what happened here ***."

¶ 24    Defendant argued further that his explanation was consistent with calling the police and waiting outside the apartment for their arrival.  It would not have made sense for him to call the police, then strangle J.N. while he was waiting for them.  Her testimony that there was blood in several rooms was inconsistent with her testimony that defendant strangled her, then immediately got up and answered the door.  More plausible was that she knew that the police would inquire into her taking defendant's car, so she made up the story that he attacked her.  Although she testified that she called the police, the two officers testified that they drove to the apartment to investigate a report that she had driven defendant's car without his permission.

¶ 25    Defendant argued further that J.N.'s testimony was undermined by the evidence that (1) her daughter never woke up during the alleged attack; (2) when she spoke to the officers, she was intoxicated and had just been driving; and (3) defendant called the police on her.  Further, the photographs of J.N.'s neck showed a minor scratch mark but no evidence of strangulation.

¶ 26    In rebuttal, the State contended that defendant admitted on the squad-car video that he choked J.N. and that this was how she got blood on her sweater.  Further, the State asserted that other evidence corroborated J.N.'s testimony.

¶ 27    The trial court found as follows. First, Davis and Enk were credible witnesses. Davis testified that J.N. appeared intoxicated and that there was blood in the bedroom and bathroom. Enk testified that he went to the scene in response to a report of a car being taken without permission. Further, defendant had abrasions and dried blood on the top side of one hand and could not explain how he incurred these injuries. Enk also observed defendant's swollen ankle and drove him to the hospital for treatment.

¶ 28    The court then summarized J.N.'s testimony, noting that she stated that her teenage daughter was asleep in her bedroom at all pertinent times. The court observed that corroboration is not always present in cases like this. The court continued:

> "[T]he court, with respect to the squad[-]car video *** portions that were admitted into evidence *** the defendant is somewhat—he's upset that the officers believed the woman and not the man in this matter. Keeping in mind that, again, apparently the officers were dispatched to that location not for the report of a domestic battery but for an issue concerning a vehicle taken without permission.
>
> There's a number of other issues that the court has with respect to the testimony here. With respect to the evidence, that there was a confrontation in the front entry way, that there was a struggle, that there was yelling, there was name calling, that testimony's not borne out by the testimony of the officers.
>
> The court does find that to be somewhat incredulous [*sic*] that this confrontation occurred, this name calling, this struggle occurred without waking a 13-year-old child. The child, notwithstanding the nature of what occurred, that child never woke up, didn't hear anything, so that calls into doubt the intensity of the struggle.

The testimony from [J.N.] is that once there was a knock on the door, [defendant] got up, answered the door, and then spoke to the officers. The testimony is that he spoke to the officers outside—or the police officer outside. Unexplained is how blood is not only on the sleeve of the sweater but in the bathroom, on top of the comforter, and on the couch. But based on that, I mean, the court has difficulty finding [J.N.] to be credible in her testimony.

But, beyond that, while [defendant] in the squad car was protesting his arrest and protesting the fact that the officers believed a woman more than they believed him, he states I know I choked her because I was trying to get my keys. Based on that statement in the squad car, I'm going to find [defendant] guilty of count [I] ***."

¶ 29 The court merged the misdemeanors (case No. 18 CM 48) with count I.

¶ 30 Defendant filed a posttrial motion, contending that the evidence was insufficient. He argued that the case "came down to" his statements in the squad car but that the court had not considered his words in context. Defendant offered this transcription of what he said on the video:

"Everybody is always going to believe a f*** female over a male. I know I, I, deserved it[1] because I had my blood on her f*** sweater because I was trying to get my keys. *Dude that's b*** dude. That's b***.*" (Emphasis added.)

¶ 31 Defendant argued that the emphasized words showed that he was denying the accusation—not confessing. He argued alternatively that a confession alone was not legally sufficient to establish guilt beyond a reasonable doubt.

---

[1]Defendant claimed to hear "I deserved it," rather than "I choked her," on the video.

¶ 32    At the hearing on defendant's motion, he played the squad-car video in open court and again maintained that the State had mischaracterized it. He asserted that he had said, "I deserved it," not "I choked her." He further argued that, even under the State's interpretation, its conclusion that defendant confessed was incorrect:

> "And right after he said he choked, he says that's b\*\*\*. How is he identifying that as his own words, Judge? That's not what he said, Judge. And if that's what [the State] relied on for this conviction, then the conviction was false."

¶ 33    The State responded that, when defendant said "b\*\*\*," he was saying that "it was okay to do what he did to [J.N.] to get his car keys." Further, although a confession by itself is insufficient to prove guilt beyond a reasonable doubt, there was ample corroboration here.

¶ 34    In ruling on the motion, the trial court stated, in full:

> "All right. I had a chance to review the motion to reconsider and/or motion for new trial in advance of today's hearing. Considering the arguments of counsel and the applicable case law, based on that, I will find on that basis I'm going to deny it."

¶ 35    The trial court sentenced defendant to 30 months' probation and 70 days' jail. He timely appealed.

¶ 36                                II. ANALYSIS

¶ 37    On appeal, defendant contends that he was not proven guilty beyond a reasonable doubt of domestic battery under the facts as the trial court found them. Defendant interprets the trial court's explanation of its finding of guilt as (1) rejecting reliance on J.N.'s account of the crucial encounter and (2) implying that, but for defendant's confession in Enk's squad car, the court would have found him not guilty. Defendant maintains, however, that his statements to Enk cannot be reasonably construed as a confession. Thus, he claims that his conviction was improper.

¶ 38    We set out the general principles of review. In deciding on the sufficiency of the evidence in a criminal case, a reviewing court must inquire "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *People v. Baskerville*, 2012 IL 111056, ¶ 31. "Under this standard, all reasonable inferences from the evidence must be allowed in favor of the State." *Id.* Thus, our deference extends even to the fact finder's "reasonable inferences from undisputed evidence." *People v. Norwick*, 261 Ill. App. 3d 257, 263 (1994).

¶ 39    We turn to the specifics here. Defendant's conduct as described in J.N.'s testimony met all elements of the charged offense. Also, her testimony was corroborated by evidence that defendant did indeed strangle her.[2] This evidence included (1) the injuries to defendant's knuckles and his implausible statement to the police that he did not know how he got them, (2) the complaints J.N. signed alleging that defendant placed his hands around her neck and choked her, (3) the photograph showing the discoloration of J.N.'s neck, and (4) defendant's admission that he and J.N. had engaged in a heated confrontation of some kind.

¶ 40    Based on our review of the evidence, although the trial court *could have* found defendant guilty beyond a reasonable doubt based wholly on evidence other than the squad-car video, it did not do so. Instead, the court found that J.N. was *not* a credible witness, and it unmistakably implied that defendant's statements on the squad-car video were crucial to the finding of guilt. Indeed, the court relied solely on defendant's statement, "I know, I choked her because I got my blood on her f*** sweater cause I was tryin' to get my keys." "*Based on that statement*" (emphasis added), the court found defendant had confessed to choking J.N.—the gravamen of the charges.

---

[2]There was no dispute that J.N. was a family member.

¶ 41    In moving to reconsider the judgment, defendant argued that, taken in context, his words could be viewed only as a denial, not as a confession.  Defendant told Enk that he was the innocent victim of the law's preference for believing women over men.  He then claimed that he "didn't do anything." Then, after a short pause, he said, "I know, I choked her because I got my blood on her f*** sweater cause I was tryin' to get my keys."  He added twice, "That's b***."  The State argued that defendant's statement meant that it was appropriate to treat J.N. as he did after she refused to turn over his keys.  The trial court held for the State but did not explain its holding.

¶ 42    The resolution of this case thus depends on our review of the trial court's interpretation of defendant's recorded remarks.  Defendant contends that our review is *de novo* because, with the squad-car video in front of us, we are no less able than the trial court to scrutinize defendant's demeanor—in contrast to when we review the proverbial "cold record" of courtroom testimony.

¶ 43    We disagree.  First, regardless of whether the trial court had a superior vantage point regarding the squad-car video, the court indisputably had the advantage concerning the trial testimony.  "[W]here the evidence before a trial court consists of depositions, transcripts, or evidence otherwise documentary in nature, a reviewing court is not bound by the trial court's findings and may review the record *de novo*." *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 453 (2009).  Here, however, there was both testimonial and nontestimonial evidence bearing upon the crucial factual issue of whether defendant choked J.N.  Where, as here, the trial court "has heard live testimony relating to a disputed issue of fact" and the nontestimonial evidence is not dispositive of the issue, we defer to the trial court's factual findings. *People v. Valle*, 405 Ill. App. 3d 46, 56 (2010); see *People v. Span*, 2011 IL App (1st) 083037, ¶ 27.

¶ 44    Second, defendant overlooks that our deference extends to more than just the fact finder's resolution of evidence conflicts and the credibility determinations prerequisite to resolving those

conflicts. As noted earlier, we must also defer to the fact finder's choice of what reasonable inferences to draw from the evidence, even when that evidence is undisputed. See *Baskerville*, 2012 IL 111056, ¶ 31; *Norwick*, 261 Ill. App. 3d at 263. And, if the fact finder does not explicitly state what inference it drew from the evidence, we must still allow a reasonable inference that favors the prosecution. *Baskerville*, 2012 IL 111056, ¶ 31; *People v. Martin*, 2011 IL 109102, ¶ 15.[3]

¶ 45 Given the foregoing, we must resolve the conflict on appeal in favor of the prosecution. Defendant argued that his remarks, taken as a whole, did not imply an admission that he committed an element of the charged offenses. The State argued that they did. The trial court sided with the State's conclusion, if not its reasoning, when it inferred that defendant's statement that he strangled J.N. was a straightforward admission and not a matter of irony or sarcasm. In our view, the State's and the trial court's interpretation was reasonable. To reverse the judgment, we would need to exalt defendant's inferences over the trial court's inferences, and the deferential standard of *Baskerville* forbids this.

---

[3]We note that our conclusion is consistent with foreign authority requiring "appropriate deference to the trial court," even as to video evidence, "unless and until there is a reason such deference is not appropriate." *Love v. State*, 73 N.E.3d 693, 699 (Ind. 2017). This approach would " 'give almost total deference to the trial court's factual determinations unless the video recording indisputably contradicts the trial court's findings.' " *Id.* (quoting *State v. Houghton*, 384 S.W.3d 441, 446 (Tex. Crim. App. 2012)). *Love*, we acknowledge, involved a video that did not fully capture the events addressed in the live testimony, while this case involves the interpretation of an event that was captured in full on the video. Nonetheless, the overarching principle is the same.

¶ 46                                III. CONCLUSION

¶ 47    For the foregoing reasons, we affirm the judgment of the circuit court of Kendall County.

¶ 48    Affirmed.