THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. OSCAR M. GOMEZ, Defendant-Appellant.

Second District No. 2—89—0574

Opinion filed June 18, 1991.—Rehearing denied July 24, 1991.

G. Joseph Weller, Thomas A. Lilien, and Manuel S. Serritos, all of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE NICKELS delivered the opinion of the court:

After a jury trial, defendant was found guilty of seven counts of first degree murder, and judgment of conviction was entered on each guilty verdict. Although the State sought the death penalty, the court sentenced defendant to 40 years' imprisonment with his sentences to run concurrently. Defendant appeals, asserting that: (1) the State's entirely circumstantial case did not prove defendant guilty beyond a reasonable doubt; (2) the trial court's failure to grant a continuance of the hearing on defendant's post-trial motion alleging ineffective assistance of his trial counsel was an abuse of discretion; and (3) the trial court incorrectly entered judgment and sentence on each of the seven guilty verdicts, and such sentence was excessive. We reverse defendant's conviction and vacate his sentence.

Sometime on Tuesday, May 24, 1988, 80-year-old Julia Menoni (victim) was murdered in her home. The victim's body was not discovered until 5 p.m. on Wednesday, May 25, 1988, approximately 24 hours after her murder. The victim's glasses were found in her kitchen, in which chairs had also been overturned. Drawers and cabinets in the bedroom and kitchen were open and had apparently been ransacked. The victim had been killed, and her body was discovered on the couch in the living room, which adjoined the kitchen. Neither

the living room nor a den, which also adjoined the kitchen, had been ransacked. The victim's home was rather run-down and cluttered and best described as less than neat and clean.

The victim was killed in a particularly brutal fashion. She had been beaten, stabbed twice, strangled, and her throat slashed. Thus, a great deal of blood was present at the scene. Additionally, the victim had been struck in the back of the head with a gallon can of paint with enough force to dent the can and bend the lid, thereby spraying the victim and the living room with paint.

Next to the victim's home was a transient rooming house, which the victim owned and in which she rented rooms on a weekly basis. Similar to the victim's home, the rooming house, too, was relatively run-down. Approximately 22 men lived in the 11 rooms in the rooming house, paying a little less than approximately $30 each per week in rent. Many of the roomers, including defendant, worked seasonally as landscapers and returned to homes and families in the southwest during the winter months. An apartment located above the victim's detached garage was rented on a monthly basis to a tenant with children. Both the roomers and the apartment tenant paid the victim in cash, with the weekly rents paid on Sunday or Monday each week. Rents were paid to the victim in her kitchen, with the roomers seated inside the kitchen in a chair next to the back kitchen door while the victim made out a receipt or made change. On occasions when more than one roomer arrived at a time to pay rent, one would sit and the others would stand in the kitchen. The victim made change from cash kept in her apron and placed the cash rent receipts under one of a number of layers of table cloths on her kitchen table. The victim's kitchen was 11 by 14 feet and, in addition to the typical kitchen appliances and cabinets, contained a table and three chairs.

The victim's body was discovered by three of the roomers from the adjacent rooming house. Not having seen the victim for over a day, the roomers entered the house after knocking and discovered the victim's body. One of the roomers had a local shop owner call the police, who were directed through the back kitchen door and into the living room of the house by the apartment tenant.

Evidence collected from the victim's house by the police included a fingerprint from an open and apparently ransacked kitchen drawer located 11 feet 11 inches from the back kitchen door. Three hairs were found respectively on the victim's chin, hip, and on the sheet used to move her body. Two floor tiles with footprints in paint on them were collected as evidence, and over $100,000 in cash was found hidden throughout the rooms of the victim's home, including $180

found in a small leather wallet in the kitchen drawer from which the fingerprint had been obtained. Numerous other paint and blood samples were also collected, which were eventually identified as originating either from the smashed paint can or from the victim. Additionally, still other hairs, fingerprints, and blood samples, which were either not identified or incapable of identification, were collected. The police also collected from the hallway of the rooming house a drop of blood located 1½ to 3 feet from the door of the room shared by defendant with another roomer and paint from the exterior doorknob and door frame of that room.

On Monday, May 23, 1988, defendant did not work at his landscaping job due to the weather, but he spoke with his sister at the bank where she worked to purchase a money order with his prior week's pay to send to his wife and son in Eagle Pass, Texas. On May 21, 1988, defendant's wife had written to tell him of their son's eye infection and her need for money to pay for his hospitalization. Defendant did not report for work on May 24, but his sister again saw him on the street with two other individuals, at which time he was wearing the same clothes as the day before.

The apartment tenant testified to having heard voices and smelled something burning in the alley next to the garage and beneath her windows at 5:30 p.m. on May 24, 1988. Upon checking the source of the smoke, she discovered sheets and a towel with bloodstains were being burned. However, when she entered the rooming house and shouted to find the person responsible, no one answered.

At 10:30 p.m. of the evening of May 24, 1988, defendant went to his employer's home in an attempt to borrow $100, which his employer refused to lend him. In the early morning hours of May 25, 1988, defendant spoke with his roommate, offering to share a pizza and beer with him, and defendant's roommate saw him in their room later that morning when the roommate left for work. Later that day, defendant again visited his sister at the bank and was again wearing the same clothes as the previous two days.

Defendant took his belongings from his room and traveled to Kenosha, Wisconsin, on May 25, 1988, where he registered with the State in an attempt to obtain employment at a local large car manufacturing plant. He obtained a temporary position at that plant and worked over the Memorial Day holiday weekend. Defendant's prior employer, a landscaper, testified that it was not uncommon for employees to change or leave jobs without notice.

During his stay in Kenosha, defendant encountered some difficulty with the individuals with whom he was staying and contacted

the police for aid in recovering his property, including his wallet. On June 2, 1988, after learning that the police wished to question him about events surrounding the victim's death, defendant's brother and father traveled to Kenosha to pick up defendant and drove him to the police station investigating the victim's death. Defendant remained at the police station from 4 a.m. until 8 a.m. on June 2, 1988, where he voluntarily answered questions and at that time also voluntarily provided the police with his fingerprints and hair samples, as well as access to his belongings.

Defendant's father gave him $125 on June 5, 1988, so that defendant could travel to Texas to join his family, and on June 6, 1988, defendant with his wife and child went to live with his mother in Eagle Pass, Texas, located five miles from the Mexican border. Later that day, defendant's mother received several unusual phone calls, and, eventually, the police called and explained that an Illinois warrant had been issued for defendant's arrest. Defendant spoke with the police, who informed him they would arrive in 45 minutes to arrest him. However, after several hours defendant and his family advised the police he would turn himself in voluntarily, and as they left for the Texas police station, the police arrived and followed their car as an escort.

The fingerprint found at the murder scene on the kitchen drawer was that of defendant. Although the drop of blood found in the hallway of the rooming house near the door of defendant's room was too small to allow positive identification, tests revealed that it was not defendant's, but it was possible that it was the victim's. Further, tests performed on the three unidentified hairs found at the scene revealed that they shared some similarities with defendant's hair, although they also were dissimilar in several other respects. The State's expert admitted that hair generally does not possess sufficiently unique characteristics to allow positive identification. So, too, the paint samples taken from defendant's shirt, key chain, and the room doorknob and doorjamb, although paint again lacks unique characteristics to allow positive identification, could have shared a common origin with the paint found in the can with which the victim had been struck. However, no technology exists to determine the length of time paint has been on a surface. The paint impressions of footprints left on the victim's tiled kitchen floor did not match defendant's shoes, nor did the other blood, hair, and fingerprint samples match those of the defendant.

Defendant was indicted on seven counts of first degree murder—murder (intent to kill), murder (strong probability of death or great

bodily harm), felony murder (home invasion), felony murder (robbery), felony murder (attempted robbery), felony murder (armed robbery), felony murder (attempted armed robbery). (Ill. Rev. Stat. 1987, ch. 38, par. 9–1.) The State argued that defendant's fingerprint on a ransacked kitchen drawer located almost 12 feet from the doorway and chair where tenants were allowed, the presence on the victim's body or in the immediate vicinity thereof of hairs that were similar to defendant's, paint found on defendant's shirt, key chain, doorknob and doorjamb that could have shared a common origin with the paint in the can used to bludgeon the victim, and blood outside the doorway to his room that could have been that of the victim were evidence that defendant had murdered the victim. The State argued that defendant had been motivated by the need for money, as evidenced by his attempt to borrow from his employer and his wife's letter requesting money. It was the State's contention that defendant murdered the victim in the course of or for the purpose of robbing her and that his flight to Kenosha and, eventually, to Texas, indicated a guilty mind.

Defendant did not deny that his fingerprint was in the victim's kitchen, but argued that it had gotten there when he entered the kitchen to pay his rent to the victim. Because neither the paint nor hair evidence was a positive identification, defendant argued that the hair was not his or had come to rest on the victim as airborne matter from a prior visit and that the paint on his belongings had gotten there when he had painted a house several months before. Defendant denied any flight and asserted that resort to the police in Kenosha and cooperation with the police after his return from Kenosha indicated his lack of guilt. Finally, defendant asserted that his return to Texas was merely motivated by concern for his family and pointed to his failure to utilize the opportunity to flee into Mexico when notified of the warrant for his arrest and his voluntary submission to arrest as totally belying an attempted flight from justice.

The jury found defendant guilty of all seven counts of murder. Defendant's court-appointed trial counsel filed post-trial motions and, further, sought and was granted permission on February 24, 1989, to have the hair evidence retested by another lab, which would take approximately two weeks. The State's expert had testified at trial that he had prepared for his testimony by reviewing his procedures and results, which were not contained in his report, to satisfy his own mind that he was sure of his opinion. Based on that testimony, interpreted to express some reservations, defendant's trial counsel sought to preserve and retest the evidence to determine if newly discovered

evidence might become available, which could then be pursued through proper procedure.

On March 13, 1989, defendant's trial counsel was replaced with new counsel, who was granted a continuance to complete his review of the record and prepare an amended post-trial motion to include allegations of ineffective assistance of counsel, if appropriate, based in part on defendant's trial counsel's failure to have the hair evidence independently tested initially. On May 4, 1989, the day before hearing on that motion, defendant's counsel sought a one-day continuance to allow the lab to complete its testing to confirm its initial opinion that the hair found on the victim was not the defendant's. However, the State had also contacted the defendant's expert after notification of the new expert's contrary findings, and the expert indicated to the State that he did not have all the necessary materials and had not made a full comparison of the hairs from which to form an opinion.

The court denied both defendant's request for a continuance and his post-trial motions and entered judgment on all seven guilty verdicts. On May 12, 1989, a sentencing hearing took place, and the court found defendant eligible for the death penalty. However, the court found the mitigating factors of defendant's lack of prior criminal history, family ties, character and background as making reoccurrence unlikely. The court, therefore, sentenced defendant to 40 years' incarceration in the Department of Corrections on each count, with the sentences to run concurrently. Defendant appeals and asserts that his conviction, based as it was on entirely circumstantial evidence, was in error because the State failed to prove him guilty beyond a reasonable doubt; the trial court abused its discretion in denying his request for a continuance to allow testimony at the hearing on his post-trial motion alleging ineffective assistance of counsel; and the court incorrectly imposed judgment and sentence on all seven charged offenses and that such sentence was excessive.

Turning to defendant's first-asserted error, he argues that the entirely circumstantial evidence adduced by the State failed to prove him guilty beyond a reasonable doubt. We agree.

■■ It is the function of the jury to determine the credibility of the witnesses and assess the weight to be afforded evidence, and we may not lightly set aside such findings, nor substitute our own judgment for that of the jury. (*People v. Boclair* (1989), 129 Ill. 2d 458, 474; *People v. Stevenson* (1962), 25 Ill. 2d 361, 365.) However, it is our duty, and we will not hesitate to reverse a judgment of conviction where the evidence is such that no rational trier of fact could have found a defendant guilty beyond a reasonable doubt because, taken in

the light most favorable to the prosecution, the evidence is so palpably contrary to the verdict or the verdict is so unreasonable, unsatisfactory, or improbable as to raise a reasonable doubt of defendant's guilt. (*Boclair*, 129 Ill. 2d at 474-75; *People v. Walker* (1987), 154 Ill. App. 3d 616, 626.) To sustain a conviction, the evidence must support a reasonable and moral certainty that the defendant committed the crime. *People v. Berland* (1978), 74 Ill. 2d 286, 308, *cert. denied* (1979), 444 U.S. 833, 62 L. Ed. 2d 42, 100 S. Ct. 63.

■ Circumstantial evidence is sufficient to sustain a conviction if it satisfies proof beyond a reasonable doubt of the elements of the crime charged. (*In re Winship* (1970), 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068; *People v. Turner* (1990), 193 Ill. App. 3d 152, 157.) It is not necessary, however, that each link in the chain of circumstances be proved beyond a reasonable doubt. (*People v. Jones* (1985), 105 Ill. 2d 342, 350; *People v. Migliore* (1988), 170 Ill. App. 3d 581, 591-92.) Rather, it is sufficient if all the circumstantial evidence taken together satisfies the jury beyond a reasonable doubt of the defendant's guilt. *Jones*, 105 Ill. 2d at 350.

■ Fingerprint evidence is circumstantial evidence (*People v. Malmenato* (1958), 14 Ill. 2d 52, *cert. denied* (1958), 358 U.S. 899, 3 L. Ed. 2d 148, 179 S. Ct. 222), and when a conviction is based solely on such circumstantial fingerprint evidence, the fingerprints must further satisfy both physical and temporal proximity criteria. (*People v. Rhodes* (1981), 85 Ill. 2d 241; *People v. Poole* (1981), 99 Ill. App. 3d 939, 942; *People v. Van Zant* (1980), 84 Ill. App. 3d 355, 357, *rev'd on other grounds sub nom. People v. Rhodes* (1981), 85 Ill. 2d 241; *People v. Donahue* (1977), 50 Ill. App. 3d 392, 393.) The fingerprints must have been found in the immediate vicinity of the crime and under such circumstances that they could only have been made at the time the crime occurred. *Rhodes*, 85 Ill. 2d at 249.

■ In this instance, a single fingerprint belonging to defendant was found in the kitchen of the victim's house. Defendant does not deny he was in the kitchen on at least two occasions prior to the murder when he paid his rent to the victim. Further, although the State argues that defendant's fingerprint was found almost 12 feet from the area in which roomers were customarily allowed when they paid their rent, the State's own witness conceded that when more than one roomer at a time arrived in the kitchen to pay the victim their rent, some would stand outside the designated area within the kitchen. Thus, the State has failed both the physical and temporal proximity requirement of fingerprint evidence. If this sole fingerprint were the

only evidence adduced by the State of defendant's guilt, we would find defendant was not proved guilty beyond a reasonable doubt.

However, although the State's case was based entirely on circumstantial evidence, it was not based solely on fingerprint evidence. We must consider whether the other circumstantial evidence, the hair, paint, blood, and defendant's alleged flight, taken together with the fingerprint evidence as a whole could have satisfied the jury of defendant's guilt beyond a reasonable doubt.

 █ As admitted by the State's witness, blood, hair and paint do not possess the necessary unique qualities of fingerprints to allow positive identification. As such, blood, hair and paint have relatively little probative value. (*People v. Mann* (1975), 30 Ill. App. 3d 508, 513.) The mere physical probabilities inferred from blood, hair and paint samples alone are insufficient to sustain a conviction beyond a reasonable doubt. (See *People v. Brown* (1984), 122 Ill. App. 3d 452, 455.) Absent other evidence, such probability evidence is inadmissible because its relation to a defendant is too tenuous to render it relevant. (*People v. Schulz* (1987), 154 Ill. App. 3d 358, 366.) Only when such evidence is only one link in a chain of circumstantial evidence (*People v. Gillespie* (1974), 24 Ill. App. 3d 567, 574), or used to exclude a defendant or another individual as the perpetrator is such evidence admissible. (*People v. Johnson* (1972), 8 Ill. App. 3d 457, *later proceeding* (1976), 37 Ill. App. 3d 328.) Hair evidence specifically has been allowed to corroborate eyewitness or other physical evidence when it was identical (*People v. Giangrande* (1981), 101 Ill. App. 3d 397, 403) or microscopically indistinguishable from that of the defendant. (*People v. Walsh* (1980), 80 Ill. App. 3d 754, 761, 765.) Although probability evidence based on hair or blood is admissible as minimally probative when it corroborates eyewitness testimony (*Brown*, 122 Ill. App. 3d at 455; *Walsh*, 80 Ill. App. 3d at 761), it is not admissible when unsupported by other evidence. (*Schulz*, 154 Ill. App. 3d at 366.) Further, such evidence has been permitted when it demonstrated a temporal and physical proximity similar to that required of fingerprints. See *Giangrande*, 101 Ill. App. 3d at 403; *Johnson*, 8 Ill. App. 3d at 460-61.

Reviewing the probability evidence advanced by the State, we find it to be, at best, of minimal probative value. The paint merely "could have shared a common origin." Moreover, the paint in the can used to bludgeon the victim was an extensively distributed house brand of a national hardware chain. The blood evidence, a single drop found in a public hallway outside the room that defendant shared with another boarder, could possibly have been that of the victim. Finally, the hair

evidence could have come from defendant and, although it shared several similar characteristics, it also differed in several respects. The relative lack of value of the State's blood, hair and paint evidence in this instance is apparent when compared to the facts of other cases where, as a threshold question, even the relevancy of such evidence was challenged.

In *Giangrande,* the victim had been dismembered and her torso and limbs placed in plastics bags that were then placed in two boxes that were taped shut and left in a farmer's soybean field. Other boxes, bags, and rubber gloves were found near the body as well. The boxes came from the home of the defendant, who was the victim's husband, and bags, rubber gloves, and tape similar to those found with the body were also found in the defendant's home. A bloodstain on the bed rail of the defendant and victim's shared bed matched that of the victim, and the carpet beneath the stain had been removed and replaced. The State's expert testified that the method of dismembering the victim's body had been done by someone with an understanding of flesh, and defendant was a meat cutter by trade. The defendant had argued with the victim the morning of her death and admitted difficulty dealing with the victim, for which he was receiving counseling. The site where the victim's body was found was accessible from defendant's home. Finally, two of the three hairs found on the underside of the tape used to seal the box containing the victim's torso were microscopically indistinguishable from the defendant's arm hair. *Giangrande,* 101 Ill. App. 3d at 401, 403.

The evidence supporting admission of similar hair and blood probabilities was even more pronounced in *Johnson.* The victim had been beaten and raped in the backseat of her automobile. Blood matching that of the victim was found on the defendant's under shorts, hairs similar to defendant's were found in the backseat of the victim's car, hairs similar to the victim were found on the person of the defendant. Blood groupings based on semen recovered from the victim matched that of the defendant, but did not match that of her boyfriend, who had escaped from the car during the rape and gone for help. The defendant's teeth impression matched that found in a bite mark on the victim's breast. The victim testified that she had been ordered into the backseat with a shotgun, and a shotgun belonging to defendant's stepfather was found near the scene next to a footprint matching the heel of defendant's boot. Defendant was found in the victim's car with the victim, ostensibly driving her to the hospital after finding her near her car, when the police returned with her boyfriend to the

scene. Finally, the victim identified the voice of the defendant as that of her assailant. *Johnson*, 8 Ill. App. 3d at 460-61.

In addition to the hair, blood, and semen-based blood evidence in *Mann*, a pair of military-issued eyeglasses with a prescription identical to that worn by the defendant, who was in the military, were found at the scene. The probability of another individual with the identical prescription was one in four trillion. The probability evidence further excluded the victim's husband as possible source of the semen. *Mann*, 30 Ill. App. 3d at 511-12.

By comparison, the hair, blood and paint evidence in this instance is of little probative value. Therefore, it is totally inadequate to provide the corroboration necessary to the State's circumstantial fingerprint evidence, which lacks the requisite temporal and physical proximity to alone sustain a conviction. The State, however, urges defendant's flight as an additional fact of circumstantial evidence to support the totality of its evidence in this case.

The State urges not only defendant's travel to Kenosha, Wisconsin, but to Texas as examples of his attempt to flee and thereby evade justice. However, while in Kenosha, defendant approached the police to solve another problem, which is hardly the conduct of a criminal in hiding. So, too, upon learning of the police's desire to question him, defendant returned to Illinois of his own free will and voluntarily not only answered questions, but provided fingerprints and hair samples. Nor does defendant's travel to Texas represent an attempt to evade justice. Although within a few miles of the Mexican border, defendant made no attempt to leave the jurisdiction of the United States even after he learned that a warrant had been issued for his arrest. The State's evidence of defendant's flight to evade justice is, at best, controverted and more realistically is simply improbable. We should decline to give such improbable evidence the extraordinary weight that would be necessary to substantiate the State's faulty fingerprint evidence. Thus, defendant was not proved guilty beyond a reasonable doubt.

For these reasons, defendant's convictions are reversed, and his sentences are vacated. (See *Burks v. United States* (1978), 437 U.S. 1, 18, 57 L. Ed. 2d 1, 14, 98 S. Ct. 2141, 2150-51.) In light of the resolution of this issue, defendant's second and third contentions need not be addressed.

Reversed.

BOWMAN and McLAREN, JJ., concur.