2020 IL App (1st) 181013-U

THIRD DIVISION
September 30, 2020

No. 1-18-1013

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 6734 |
| | ) | |
| ERIC MCWANE, | ) | Honorable |
| | ) | Timothy J. Joyce, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE HOWSE delivered the judgment of the court.
Justices Ellis and Burke concurred in the judgment.

ORDER

¶ 1    *Held*:   The judgment of the circuit court of Cook County is affirmed; the State proved beyond a reasonable doubt that defendant recklessly caused an injury to his infant son; and the trial court did not err in admitting evidence of a child abuse pediatrics expert's interview of the infant's mother concerning the events of the night the child suffered the injury.

¶ 2    The State charged defendant with aggravated battery and aggravated domestic battery, in that defendant allegedly "grabbed L.M., [a child under the age of 13 years who is a family member] about the body causing a fracture to his left ankle."  L.M. is defendant's son and was 13-months old at the time of the offense.  Following a bench trial in the circuit court of Cook County defendant was convicted of the lesser-included offense of reckless conduct and, based on

defendant's criminal history, sentenced to an extended-term Class 4 felony term of imprisonment for six years.

¶ 3    For the following reasons, we affirm defendant's conviction for reckless conduct.

¶ 4                                    BACKGROUND

¶ 5    At the time of the offense L.M., born February 21, 2016, lived with his mother Lisa Edwards and father, defendant, in an upstairs unit in Edwards' parents' home.  Edwards also had a 12-year-old son who lived downstairs with his grandparents.  Edwards testified at defendant's bench trial.  The State also introduced three out-of-court statements by Edwards: one to a police detective, one to a social worker, and one to a physician at the hospital where L.M. received treatment for his injuries.  At the trial Edwards testified that on April 3, 2017, L.M. was "fussy" and would not lie on his back.  At 9:40 p.m. that night Edwards recorded a video on her cell phone of L.M. standing on both of his legs and dancing and giggling to a music video.  Edwards and L.M. went to sleep at 10:30 p.m.

¶ 6    Edwards testified defendant worked the 2:00 p.m. to 11:00 p.m. shift at a meat packing plant.  On the night of April 3, 2017, defendant stopped at a gas station on his way home and bought some snacks for the two children.  L.M. woke up when defendant got home and defendant and L.M. laid on the bed together eating snacks and watching music videos.  Defendant, Edwards, and L.M. went to bed at 12:20 a.m.  L.M. did not want to sleep in his bassinet so Edwards placed L.M. on her chest where L.M. fell asleep.  Edwards testified she awoke shortly after 3:00 a.m. with L.M. lying on her stomach.  L.M. needed to have his diaper changed.  Edwards tried to change L.M. but L.M. was fussy and would not lie on his back.  Edwards was concerned something was wrong with L.M. because he would not lie on his back.  Edwards thought defendant would be able to change L.M.'s diaper so she woke him up.  L.M.

had urinated on Edwards while she was trying to change him so after waking defendant she went into the next room to retrieve a towel.

¶ 7    Edwards testified at defendant's trial that when she left the room, leaving L.M. with defendant, L.M. "was crying, aggravated, crying. He was—he was just real fussy not being his normal self. He was just really was fussy." When asked if she heard L.M. scream while she was in the next room, Edwards testified, "It wasn't like necessarily screaming. He was just fussy. He was *** already a fussy person any way in regards to me changing his pamper. So it was like something was bothering him. But I didn't know what it was." Edwards testified she returned to the bedroom because L.M. "wouldn't stop crying." Edwards testified, "It was just like he was so aggravated and agitated like that's what made me come back in the room like what is going on with my baby." Edwards testified that when she returned to the room she asked defendant, "what is going on with my baby?" L.M. was in defendant's arms. L.M. was not crying anymore. However, when Edwards took L.M. from defendant "that's when [L.M.] just started screaming and acting like something was really bothering him." Edwards testified that when she took L.M., "that's when *** the crying got really, really bad."

¶ 8    Edwards consulted her mother to try to calm L.M. then called 9-1-1. She was advised to take L.M. to the hospital herself which she and defendant did. Defendant and Edwards took L.M. to a nearby hospital. L.M. received an enema for pain. A doctor tried to feed L.M. but L.M. would not eat. The hospital performed an abdominal x-ray and discovered there was a screw in L.M.'s belly. Edwards testified she was in the hospital room holding L.M. in her lap when she "noticed his little foot, like his little foot was limped over." She described it as, "Like a dangling little foot." Edwards had been at the hospital over an hour when she first saw the foot and alerted medical personnel. Personnel at the first hospital performed x-rays of the foot and

then an ambulance transported L.M. to a children's hospital. The children's hospital took additional x-rays. Medical personnel later told Edwards the screw would pass though L.M. naturally. At the children's hospital Edwards spoke to a social worker and, later that day, the head of child abuse pediatrics.

¶ 9 The trial court allowed Edwards to testify that she told the social worker, Stutz, that when she was out of the room away from defendant and L.M., L.M.'s cry "went from a fussy cry to a big cry like irritation and pain at the same time." She clarified, "it was just like a more—like a more painful cry, like something was wrong." When asked if Edwards told the social worker that when Edwards went back into the bedroom she said to defendant, "what the [expletive] happened to my baby?" Edwards testified she did ask defendant "What happened to my child?" but Edwards denied using profanity. (Stutz would later testify that Edwards told Stutz that when Edwards went back into the bedroom Edwards did say to defendant, "What the [expletive] happened to my baby?"). The State asked Edwards whether, after the social worker asked Edwards if Edwards was concerned something happened while she was out of the room, Edwards responded, "abso[expletive]lutely, my baby was fine with me and now he has a broken leg," but Edwards denied it. (Stutz testified that was what Edwards said.)

¶ 10 Edwards also testified that she spoke to a doctor named Narang later that morning or afternoon. Edwards recalled telling the doctor that when she first awoke in the early hours of April 4, L.M.'s legs were lying open and she did not need to touch them to try to change L.M.'s diaper. Edwards testified that she told Dr. Narang that she tried to change L.M.'s diaper but L.M. was very fussy. Edwards told Dr. Narang that while she was trying to change L.M. the baby urinated on her and that is when she woke defendant then left to retrieve a towel. When

Edwards left the room L.M.'s cry changed. The crying became louder. Edwards later learned from personnel at the children's hospital that L.M.'s leg was broken.

¶ 11    Dr. Sandeep Narang was the division head of Child Abuse Pediatrics at the children's hospital. Dr. Narang interviewed Edwards and defendant at the children's hospital and examined L.M. in their presence. He also reviewed the medical records from the first hospital generated from L.M.'s treatment there before being taken to the children's hospital. Dr. Narang testified as an expert in child abuse pediatrics and was permitted to offer expert opinion on that subject. Dr. Narang interviewed both parents before he examined L.M. He testified that it is typical practice to gather a history from the caregivers then examine the child. Dr. Narang testified that Edwards told him that she awoke at 3 a.m. not because L.M. was crying but just because that had been the course of her practice to get up and change or feed L.M. L.M. was lying on his back next to her on her arm. Dr. Narang testified that Edwards was laughing when she told him that L.M. urinated on Edwards. He stated, "so it kind of gave the impression that she was not upset or frustrated by that event. She at least didn't indicate that."

¶ 12    The defense objected to Dr. Narang's testimony regarding what Edwards said to him as "cumulative." The court ruled as follows:

> "Your objection is sustained in part, overruled in part.
>
> It is not admissible for the truth of the matter asserted. Miss Edwards wasn't asked about what she said to the doctor. She was asked what she said to the state's attorney and what she said to the social worker and the investigating detectives. So it's not 115-10.1. She didn't make any affirmation that she did or did not say these things to Dr. Narang. So it's not admissible either under 115-10.1, nor is any kind of prior consistent statement. It is admissible for the non-

hearsay purpose of explaining in part, I presume, the basis of the doctor's

opinions, so it would only be accepted for that necessary purpose.

So affirmed in part and overruled in part."

¶ 13     Dr. Narang continued, testifying Edwards woke defendant to help her change L.M.'s diaper and at that point defendant told her there was a towel in the adjacent room which Edwards went to retrieve.  He testified, "She stated that she was gone no more than a minute outside of the room, and then she heard a much different, louder, really concerning cry that caused her to rush back into the room."  Before she had left the room, L.M. was "a little bit whining, but not crying like in pain, or anything like that.  But that was the basis for her rushing back into the room is hearing what was clearly distinctly different in her mind."  Dr. Narang testified Edwards told him "she rushed back into the room and she saw [defendant] holding [L.M.] in his arms."  Edwards told Dr. Narang that in the days leading up to this incident L.M. was completely normal, he had no medical symptoms whatsoever.  Edwards showed Dr. Narang a video of L.M. dancing which was time stamped 9:42 the night before.

¶ 14     Dr. Narang testified he also interviewed defendant.  Dr. Narang testified that when he was first speaking with defendant, defendant's demeanor was calm and defendant was normally conversant.  Defendant gave Dr. Narang the history up until the point where L.M. woke up in the middle of the night.  Dr. Narang testified defendant told him either he or Edwards put L.M. in a bassinet where L.M. usually sleeps, "which was a little bit discrepant than what the mother indicated."  When Edwards woke defendant "he said *** he had gone into the adjacent area *** to make a bottle for [L.M.,] and that he had made a bottle and brought it back" at which point "he saw [L.M.] pee on mother."  Dr. Narang testified, "Again, that was a little bit discrepant

from what mother told me." That was when defendant told Edwards to get the towel and defendant would change the diaper.

¶ 15 Dr. Narang testified that defendant "was still fairly calm at this point. It was at the point of the actual changing of the diaper and trying to grasp L.M.'s ankles that I think his demeanor changed." Dr. Narang testified, "He became I think really a lot more raised in voice, escalated. He had significant hand gestures which were very loud. These were kind of startling sounds and changes to the people that were outside of that sort of large trauma bay door to the point where the nurses alerted security and asked security to go by the door to make sure I was okay." Dr. Narang continued:

> "It was at this point that he admitted that the fracture occurred while he was changing or trying to change the diaper. He indicated that he didn't realize his own strength in relation to what he described as L***'s soft bones. He stated that he had believed that the bones would be stronger because L*** was up and running around and dancing and being able to do activities like that. But that it was -- and he used words that I put in my notes that I remember specifically he said, 'it's all on me, I did it, they'—and when I asked him who he was referring to 'they,' he meant the maternal grandmother and mother had nothing to do with it. He used, you know, colorful language, said, 'I [expletive] up; they had nothing to do with it.' "

¶ 16 Dr. Narang testified certain portions of children's bones are susceptible to fractures in certain forced directions but this type of fracture would have actually been a lot more difficult to cause given the anatomic structure of the bone at this age because those bones are "a little bit more, they're a lot more cartilaginous, and therefore a lot more bendable, in sort of a transverse.

So they're resistant to bending in transverse direction." Dr. Narang opined, "given the cartilaginous anatomy of the bone at that areas it would have been a significant violent bending force." He stated that L.M. squirming while someone was "just merely using normal force holding his ankles" could not have caused this type of fracture nor could "the mere act of [L.M.] flipping over while his diaper was being changed" because "that sort of self-initiated movement would not be a reasonable explanation to generate this fracture." Dr. Narang's expert opinion to a reasonable degree of medical certainty was that L.M.'s fracture was caused by non-accidental trauma.

¶ 17    On cross-examination Dr. Narang testified that when Edwards returned to the room and defendant was holding L.M., Edwards stated "the baby was fine." L.M. was not crying; but when Edwards tried to pick up L.M. he became inconsolable again. Dr. Narang testified that defendant stated "I did it. They had nothing to do with it. It was me, all me. I [expletive] up. They can do whatever the [expletive] they want with me, but they ain't going to do nothing with my baby." Dr. Narang did ask defendant "as to how [defendant] fractured an ankle of the child" but defendant did not respond. When asked again about L.M.'s behavior when Edwards returned to the bedroom and defendant was holding L.M. who was "fine," Dr. Narang testified L.M. was "fine" at that "instantaneous moment." Dr. Narang continued, "It could have been a soothing gesture. It could have been anything. But it didn't compromise the way the child was before and thereafter for a more extended period of time. Dr. Narang testified he did not have "a comment on exactly when the injury occurred" only that it is "not consistent with an accidental mechanism."

¶ 18    On re-direct Dr. Narang testified that the calmness Edwards observed when she returned to the room was not inconsistent with the break having happened while she was out of the room;

rather it could have been self-soothing, but "what you know was that immediately thereafter when she grabbed him he was demonstrating again significant discomfort such that he was not normal thereafter." He also testified L.M. would not have been dancing in the 9:42 p.m. video if his leg was fractured, so it was Dr. Narang's opinion the injury occurred sometime after the video was recorded, but he could not say exactly when.

¶ 19    The examination revealed a comminuted fracture of L.M.'s left tibia near the ankle. The tibia is the "shin bone" and "comminuted just means a fragmentation or almost at least shattering of the bone to smaller fragments of that area." Dr. Narang testified these types of fractures "are known to require higher degrees of force to generate." He opined based on the fracture pattern, which was "directly trans, across the bone and up slightly and down towards the joint space" it would have been a bending motion that caused the type of fracture that he observed in L.M.'s leg.

¶ 20    Later that evening Edwards spoke to a Detective and an Assistant State's Attorney. Assistant States Attorney (ASA) Charles Prochaska and Detective Boush interviewed Edwards. The interview was recorded and the trial court admitted the recording into evidence. Edwards testified to telling the detective and ASA that Edwards told the Detective and ASA that when she was out of the room she heard L.M. scream and that she had never heard L.M. cry like that before. Edwards told them she was out of the room for a minute to a minute-and-a-half. However, Edwards stated it was "Not even a scream. He was really fussy. It was just like he was crying already. It was just like his cry got a little louder. And it increased a little bit longer. It wasn't necessarily like, ahh, somebody killed me. He was just already fussy." She testified "Scream is just a little too dramatic." Edwards testified she told the Detective and ASA that she went back into the room and said to defendant: "what did you do to my baby?" The parties

stipulated to the admission of the video recording of Edwards' statement to police. In relevant part, on the video recording, Edwards testified that after she returned to the room and Edwards took L.M. from defendant, L.M. screamed even more every time she shifted L.M.

¶ 21    When the case concluded, in an oral ruling the trial court found defendant guilty of the lesser included offense of reckless conduct. The court began its oral ruling by noting it believed the testimony of the social worker and of Dr. Narang, and that the court believed "certain aspects of Ms. Edwards' testimony." The trial court singled out Edwards' statement to the ASA that upon returning to the bedroom she said, "What did you do to my baby," rather than what she testified to, "What's up with my baby." The court found the former "tends to indicate that [Edwards] immediately suspected by virtue of the circumstances and concluded that something had happened that led to the injury *** at the time she was out of the bedroom." The court also recounted Edwards' answer to the social worker in response to the inquiry, "You were thinking that [defendant] hurt your baby," to which Edwards responded, "Abso[expletive]lutley. When I left the baby was fine and now he has a [expletive] broke leg. What was it you [expletive] did to my baby?" The court found this statement, like the one to the ASA, was "impeachment and they tend to and they are not considered by the Court as substantive evidence." However the court found it could consider the statements "in gauging the truth or falsity of certain of her clams on direct examination and on cross-examination." Based on those statements impeaching her trial testimony the court found Edwards' testimony she only asked, "What's up with my baby" to be "less than truthful." Given that finding the court then found that:

> "it would appear to be the case that she did in fact go in, as was indicated to [the ASA and [the Detective,] 'What did you do to my baby,' evincing a conclusion by her and one that is not out of line, that whatever happened to [L.M.] happened at

that particular time and was not a consequence of anyone rolling over on the baby or some prior injury."

¶ 22   The trial court summarized its discussion of Edwards' prior statements by stating in part, "about 3:00 a.m. with the wet diaper.  So that long narration is just to make it clear to everyone how it is that the Court views the statements to Prochaska and to Ms. Stutz by Ms. Edwards.  *** So I do believe that what happened in that window of time, for which there are certain hallmarks."

¶ 23   One such "hallmark" the trial court relied upon was that defendant "had actually changed the diaper.  *** Done, I have to conclude, before the scream or shriek or shout or however you want to describe it that came out of [L.M.] that motivated Ms. Edwards to come back into the bedroom.  Because from the time she hears this, she immediately goes back.  *** [W]hich would indicate that [defendant] had [put on the new diaper] beforehand because there was no time to do it after the child screamed."

¶ 24   After some brief discussion on this point the trial court noted Dr. Narang's testimony that defendant "admitted that while changing the diaper that was when the fracture occurred. [Defendant] didn't realize his own strength regarding [L.M.'s] soft bones.  'I believed the bones would be stronger.  It's all on me.  They, [meaning Edwards and her mother] had nothing to do with this.  I [expletive] up.' "

¶ 25   The trial court then discussed the various applicable mental states and ruled as follows: "[A]ll of which leads me to conclude that when this happened, when he was woken up, [defendant] didn't intend to see to it that [L.M.] was hurt.  He didn't intend to inflict any particular wound on [L.M.] at the time.  He somehow lashed

out or somehow put a hand or hands on [L.M.] and I tend to believe that because this all happened so fast. He wasn't ticked off. He wasn't angered. He wasn't frustrated beyond measure at whatever the child was doing for that minute or minute and a half while Lisa Edwards was gone from the room. And we know that because he actually changed the child's diaper. Whatever happened only happened in this very small period of time at the end of that period of time. That's when he did it. He didn't know that was going to happen. He didn't know that—He didn't know that that was going to be the result when he did whatever he did. It happened in an instant. He didn't intend it. He should have appreciated that it could have resulted. That's why it was reckless. And as he said, he '[expletive] up.' I do believe that this is more properly cognizable as the Class 4 felony of reckless conduct under Section 12-5(A)(2) because it did relate to great bodily harm. And I'm going to enter a finding on that lesser offense."

¶ 26    The trial court entered a finding of guilty of Class 4 felony reckless conduct on both counts of the indictment and held that the counts merge into Count I. Following a sentencing hearing the court sentenced defendant to six years' imprisonment.

¶ 27    This appeal followed.

¶ 28                                    ANALYSIS

¶ 29    Defendant challenges the sufficiency of the evidence to sustain his conviction in two respects and defendant also challenges the admission of certain evidence that allegedly unlawfully prejudiced defendant as error under the rule against the admission of hearsay. We will address each in turn.

¶ 30    A challenge to the sufficiency of the evidence raises the familiar question of whether the evidence, when considered in the light most favorable to the judgment below, *i.e.*, in the light most favorable to the prosecution, together with all reasonable inferences therefrom, would permit any rational trier of fact to find the State proved all of the essential elements of the crime beyond a reasonable doubt. *People v. Swenson*, 2020 IL 124688, ¶ 35, *People v. Carter*, 2019 IL App (1st) 170803, ¶ 30. We do this because "[o]nce a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution." (Internal quotation marks omitted.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985), quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Thus this court may not retry the defendant by reweighing the evidence or resolving conflicting evidence, reassessing the credibility of the witnesses, or drawing inferences from the evidence adverse to the defendant's guilt. *Swenson*, 2020 IL 124688, ¶¶ 35-36. These functions are the purview of the trier of fact and particularly, its credibility determinations are entitled to great weight. *Swenson*, 2020 IL 124688, ¶ 35, *People v. Garcia*, 407 Ill. App. 3d 195, 200-01 (2011) (quoting *People v. Rodriguez*, 336 Ill. App. 3d 1, 14-15 (2002)). "In cases where the evidence is close ***, where findings of fact must be determined from the credibility of the witnesses, a court of review will defer to the trial court's factual findings unless they are against the manifest weight of the evidence." (Internal quotation marks omitted.) *Id.* ¶ 36, citing *Kalata v. Anheuser-Busch Companies, Inc.*, 144 Ill. 2d 425, 433 (1991), *People ex rel. Hartrich v. 2010 Harley-Davidson*, 2018 IL 121636, ¶ 13, (citing *Kalata*, 144 Ill. 2d at 433). The testimony of just one credible witness is enough to convict. *Id.* We will only set aside a guilty verdict if the evidence is so

improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Id.* ¶ 35, citing *Collins*, 106 Ill. 2d at 261.

¶ 31    As for defendant's second argument, "because the admissibility of evidence rests within the discretion of the trial court, its decision will not be disturbed absent an abuse of that discretion." *People v. Chambers*, 2016 IL 117911, ¶ 75.  More specifically, "a trial court's evidentiary rulings on hearsay testimony and any applicable exceptions are reviewed under an abuse-of-discretion standard."  (Internal quotation marks omitted.)  *People v. Kinnerson*, 2020 IL App (4th) 170650, ¶ 33.

> "The question is not whether the reviewing court would have made the same decision if it were acting as the trial court.  Rather, the question is whether the trial court's decision is 'arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it.' [Citation.]  The abuse-of-discretion standard of review is highly deferential.  [Citation.]  Thus, we will not reverse the trial court's ruling here absent a clear abuse of that discretion." *People v. Peterson*, 2017 IL 120331, ¶ 125.

¶ 32                             Sufficiency of the Evidence

¶ 33    First, defendant argues the State failed to prove beyond a reasonable doubt that he is the person who actually caused the fracture to L.M.'s leg where there was no evidence when the fracture occurred and there was evidence several people handled L.M. between the time it is undisputed his leg was not broken and when Edwards first discovered the injury.  Defendant also challenges the sufficiency of the evidence in that defendant argues the State failed to prove defendant was consciously aware of a risk he would break L.M.'s leg.  We address each of those arguments, beginning with proof of the *actus reus*.  See *People v. Law*, 202 Ill. 2d 578, 583

(2002) (in criminal statutes the *actus reus* refers to the "wrongful deed" or "the guilty act"), *People v. Karberg*, 356 Ill. App. 500, 502 (2005) ("A crime generally consists of two parts: an *actus reus*, or a guilty act, and a *mens rea*, or a guilty mind.").

¶ 34    Defendant argues the window of time during which L.M.'s leg could have been fractured is 9:40 p.m. the night before Edwards took him to the hospital, when a cell phone video shows L.M. dancing on both legs, and approximately 4:30 a.m. when Edwards discovered that L.M.'s foot was "dangling" after having been at the hospital for over an hour and after medical personnel had seen L.M.  Those facts are undisputed.  Defendant argues that, although the State's theory of the case was that defendant broke L.M.'s leg during the one to two minute period Edwards was out of the room to retrieve a towel while defendant was alone with L.M. changing his diaper, he claims that theory "is contrary to common sense" where Edwards returned to the room to find L.M. calm and in defendant's arms smiling and waving at Edwards. Defendant argues that "[d]espite L.M. being seen by a doctor, given a bottle by a doctor, given an enema and an abdominal x-ray by technicians, none of these individuals at [the hospital] noticed that L.M.'s foot was dangling and broken."  Defendant notes that Dr. Narang could not state the time L.M.'s injury occurred and the State failed to adduce any testimony from any medical personnel who treated L.M. at the hospital, claiming these "witnesses could have further narrowed down the time frame for L.M.'s injury.  Defendant also complains the lack of the medical personnel's testimony means there is no evidence of how L.M. was "physically handled, restrained, or screamed" during his treatment.  Finally, defendant argues his "vague admissions" to Dr. Narang "do not establish that [defendant] caused L.M.'s injury."  Instead, "these statements accept responsibility generally for an injury that ostensibly occurred while L.M. was in his care.

¶ 35    First, the fact Edwards returned to the bedroom to find L.M. calm, smiling, and waving in defendant's arms does not support finding the evidence as a whole is so improbable, unsatisfactory, or unconvincing to raise a reasonable doubt of defendant's guilt. The State satisfactorily explained Edwards' observations upon returning to the bedroom by proffering a reasonable explanation that convinced the trier of fact of defendant's guilt beyond a reasonable doubt. "The trier of fact determines the credibility of the witnesses, decides what weight to give their testimony, resolves conflicts in the evidence, and draws reasonable inferences from that evidence." *Swenson*, 2020 IL 124688, ¶ 36.

¶ 36    The evidence the State proffered in this regard came from the testimony of Dr. Sandeep Narang. Narang testified L.M.'s demeanor could be explained by the fact that what Edwards observed could have been a soothing gesture to L.M. or a type of self-soothing. However, Dr. Narang testified affirmatively those circumstances did not change the fact that immediately thereafter L.M. was in distress and was not normal thereafter. Further, Edwards' testimony provides circumstantial evidence L.M.'s leg became broken while she was out of the room while defendant was changing L.M.'s diaper and that defendant was the only person in that room. As Dr. Narang noted in his testimony, in addition to the cell phone video establishing L.M.'s leg was not broken the night before, Edwards testified L.M. was only "fussy" when she awoke at 3 a.m. to change his diaper but that his crying changed after she left L.M. alone with defendant. Neither Edwards nor her mother could console L.M. after that despite the brief moment of calm when defendant was holding L.M. Dr. Narang also testified that normal handling of L.M. (we believe, like the type medical personnel would employ in treating him) or L.M.'s self-manipulation would not generate enough force to cause the injury he observed.

¶ 37    Turning to defendant's argument the State failed to adduce testimony from medical personnel at the hospital to narrow the window of opportunity for L.M.'s injury or to expose a different possible cause for it other than defendant, we find this argument unpersuasive. Initially we note there is no evidence of misconduct toward L.M. by medical personnel at the hospital. Regardless, a "lack of competent testimony may create a reasonable doubt of the defendant's guilt, *absent other sufficiently incriminating evidence*." (Emphasis added.) *People v. Workman*, 312 Ill. App. 3d 305, 311 (2000). "We further note that defendant has the right to summon all witnesses necessary for his defense. If the defendant cannot get the witness to appear, he can request the court to call him as a court's witness. In any event, the State is not required to call all possible witnesses to prove a case beyond a reasonable doubt." *People v. Franklin*, 130 Ill. App. 3d 514, 521 (1985), see also *People v. Maloney*, 201 Ill. App. 3d 599, 610 (1990) (holding missing evidence was not "required in order for a rational jury to have found [the defendant] guilty of the offense charged beyond a reasonable doubt" where "the absence of those articles of evidence does not cast a serious doubt upon the State's witness's identification of [the] defendant nor fails to produce an abiding conviction of guilt").

¶ 38    In this case defendant's argument fails because there is competent and sufficient evidence of defendant's guilt such that we are not left with a "reasonable and moral certainty" that defendant did not commit the crime. See *People v. Gomez*, 215 Ill. App. 3d 208, 216 (1991) ("To sustain a conviction, the evidence must support a reasonable and moral certainty that the defendant committed the crime."), citing *People v. Berland*, 74 Ill. 2d 286, 308 (1978). A reasonable trier of fact might infer from the fact medical personnel failed to discover L.M.'s foot that one of them broke his leg; conversely, a rational trier of fact might infer medical personnel were so preoccupied with L.M.'s pain and failure to eat they simply failed to notice his foot. We

are not permitted to draw inferences from the evidence adverse to the defendant's guilt. *Swenson*, 2020 IL 124688, ¶¶ 35-36. Moreover, in this case the trier of fact was aware of the number of medical personnel who treated L.M. at the hospital and could reasonably infer how he was handled from all of the surrounding circumstances. "[T]he trier of fact is not required to *** search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Jackson*, 2020 IL 124112, ¶ 70, *People v. Bolla*, 114 Ill. App. 3d 442, 454 (1983) (finding that evidence that was not available to the defendant was not "such as to create a new reasonable doubt of guilt that did not otherwise exist" where trier of fact heard other testimony on same subject and missing evidence was "subject to conflicting inferences"). Defendant has not demonstrated how the medical personnel's testimony would cast doubt on Edwards' or Dr. Narang's testimony nor does defendant proffer what they might say to produce an abiding conviction of defendant's innocence. *Maloney*, 201 Ill. App. 3d at 610. We are not convinced that "the evidence is so palpably contrary to the verdict or the verdict is so unreasonable, unsatisfactory, or improbable so as to raise a reasonable doubt of defendant's guilt." *Gomez*, 215 Ill. App. 3d at 216.

¶ 39 The trier of fact determined defendant broke L.M.'s leg while changing L.M.'s diaper. There is testimony in the record to support that finding. "It is well established that a verdict will not be overturned on appeal if it is supported by the record as a whole." *People v. Jackson*, 182 Ill. 2d 30, 66 (1998). "The factual determination made by a trier of fact is entitled to great weight. However, where the record does not support the finding, this court must reverse." *People v. Patterson*, 52 Ill. 2d 421, 424 (1972). "[A] verdict of guilty is not subject to reversal simply because the jury chose to believe the evidence presented by the prosecutor. [Citations.] When the evidence presented is contradictory, it is within the province of the jury to assess the

credibility of the witnesses and weigh the evidence accordingly. [Citation.]" *People v. West*, 102 Ill. App. 3d 50, 54-55 (1981). We may not substitute our judgment for that of the trier of fact in this circumstance. We hold the State proved the *actus reus* of reckless conduct beyond a reasonable doubt.

¶ 40    Turning to defendant's argument the State failed to prove defendant was consciously aware of a risk he would break L.M.'s leg, defendant specifically argues the State proved at most that his actions were negligent, not reckless, because "there was no indication that he was consciously aware that there was a risk of injury when he changed L.M.'s diaper."

> "(a) A person commits reckless conduct when he or she, by any means lawful or unlawful, recklessly performs an act or acts that:
>
> (1) cause bodily harm to or endanger the safety of another person; or
>
> (2) cause great bodily harm or permanent disability or disfigurement to another person." 720 ILCS 5/12-5 (West 2018).

The Criminal Code of 2012 defines "recklessly." 720 ILCS 5/4-6 (West 2018).

> "A person is reckless or acts recklessly when that person consciously disregards a substantial and unjustifiable risk that circumstances exist *or* that a result will follow, described by the statute defining the offense, and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." (Emphasis added.) 720 ILCS 5/4-6 (West 2018).

"The reckless state of mind may be inferred from all of the facts and circumstances in the record. [Citation.] When recklessness has been found by the trier of fact, this determination should not

be overturned unless inference of the mental state is inherently impossible or unreasonable." *People v. Watkins*, 361 Ill. App. 3d 498, 501 (2005).

¶ 41    "In general ** a defendant acts recklessly when she is aware that her conduct *might* result in *** great bodily harm, *although that result is not substantially certain to occur*, and consciously disregards that risk." (Emphases added.) *People v. Hulitt*, 361 Ill. App. 3d 634, 639 (2005). "Where there is no conscious awareness of a danger, there can be no 'conscious disregard' of that danger *** if the actions are taken. In other words, where there is no such awareness, there can be no reckless conduct." *Id.* at 640. However, "[t]he statutory definition of recklessness does not contemplate that a defendant be 'practically certain' of the result that his conduct will cause or consciously aware of the 'substantial probability' that a material fact exists as required in the statutory definition of knowledge. [Citation.]" *People v. Spears*, 112 Ill. 2d 396, 408 (1986). See also *People v. Thomas*, 8 Ill. App. 3d 690, 693 (1972) (holding "the shooting of a gun, or mere pulling of a loaded gun *** in a crowded tavern constitutes a reckless act committed in utter disregard of the safety of others," and the "person shooting need not know that he may injure some particular person, for knowledge that he may injure any person whomsoever is sufficient to impose criminal liability").

¶ 42    In this case, defendant claims the trial court found defendant was unaware L.M. would be injured during the diaper change, relying on the trial court's comments that, "He didn't know that was going to happen. He didn't know that – He didn't know that that was going to be the result when he did whatever he did. *** He should have appreciated that it could have resulted." Defendant further argues his "admission that 'he didn't realize his own strength and that [defendant] thought LM.'s bones 'would be stronger' show that [defendant] was unaware there was a risk of injury to L.M." Defendant argues the trial court's findings indicate he was

"not consciously aware of the risk of injury;" and "while there may have been carelessness or negligence on [defendant's] part and he 'should have appreciated' the possibility of risk, there was no conscious disregard of that risk."

¶ 43    Defendant makes a passing statement that the trial court "incongruously" found defendant guilty of recklessness despite finding defendant was "unaware that L.M. was going to be injured." To the extent defendant argues the trial court's judgment is inconsistent with its factual findings, we reject defendant's contention as belied by the trial court's statements. The trial court stated defendant "didn't know *that* was going to happen. He didn't know that—He didn't know that *that was going to be the result* when he did whatever he did. *** He should have appreciated that *it* could have resulted." (Emphases added.) We find that the trial court was referring not generally to any injury to L.M. but specifically to the comminuted fracture of L.M.'s leg. The trial court did not have to find that defendant consciously disregarded a risk L.M. would suffer a comminuted fracture to find that defendant was reckless in that he consciously disregarded a risk his conduct would result in great bodily harm to L.M., which it did. See 720 ILCS 5/12-5 (West 2018), *Spears*, 112 Ill. 2d at 408, *Thomas*, 8 Ill. App. 3d at 693. Our view is bolstered by the rule that the "trial court is presumed to know the law, including the allocation of the burden of proof, and to apply it properly, absent a strong affirmative showing to the contrary in the record." *People v. Groebe*, 2019 IL App (1st) 180503, ¶ 62. On the record before us defendant has not made a substantial showing the trial court misapplied the recklessness statute. Nor is the trial court's "inference of the mental state *** inherently impossible or unreasonable" in this case. *Watkins*, 361 Ill. App. 3d at 501.

¶ 44    Which brings us to defendant's argument the State failed to prove he was "reckless." We must reject defendant's position. In this case, to prove the requisite *mens rea* beyond a

reasonable doubt (see *People v. Giraud*, 2012 IL 113116, ¶ 21 ("*mens rea*" for the offense at issue was "recklessness"), *People v. Nelson*, 2013 IL App (3d) 120191, ¶ 26 (State must prove the defendant performed the *actus reus* with the requisite *mens rea* beyond a reasonable doubt)), the State had to prove beyond a reasonable doubt defendant consciously disregarded "a substantial and unjustifiable risk" that applying a "significant violent bending force" or even a "high degree of force" to L.M.'s leg would "cause great bodily harm" to L.M., an infant or that circumstances existed that such an act would cause great bodily harm to L.M. (720 ILCS 5/4-6 (West 2018)). See *People v. Martin*, 401 Ill. App. 3d 315, 322 (2010) (stating what State had to prove in prosecution for reckless conduct). In other words, the question for this court is whether it is "inherently impossible or unreasonable" (*Watkins*, 361 Ill. App. 3d at 501) to infer beyond a reasonable doubt that defendant consciously disregarded a substantial risk that bending his infant's son's leg with something more than "normal" force would cause great bodily harm where, *arguendo*, defendant did not "realize his own strength" and thought the baby's bones were stronger.

¶ 45    Our supreme court has instructed us that "[r]isk is the essence of recklessness." *Giraud*, 2012 IL 113116, ¶ 21. Thus, the State did not have to prove defendant was "practically certain" his act would cause L.M. great bodily harm, only that the risk of such harm was substantial. *Spears*, 112 Ill. 2d at 408. Absent defendant's assertion the trial court's findings indicate defendant was unaware there was a risk of injury to L.M., which they do not—viewed in a light most favorable to the prosecution they at most indicate defendant did not know he would fracture L.M.'s leg--, defendant's "admission" he did not realize his own strength and belief L.M.'s bones were stronger is insufficient to overcome the determination made by the trier of fact. Regardless of defendant's subjective misconceptions, the evidence is sufficient to permit the trier

of fact to reasonably infer defendant consciously disregard the consequences of the risk from his act of "trying to grasp [L.M.'s] ankles" with the significant or high degree of force that would have been necessary to break L.M.'s leg while he was changing L.M.'s diaper. See generally *Giraud*, 2012 IL 113116, ¶ 21. Defendant was an adult male warehouseman and L.M. was an infant. That is enough. Moreover, we find that the risk of applying the degree of force Dr. Narang testified was required to cause the injuries he observed to an infant is objectively substantial. See *Watkins*, 361 Ill. App. 3d at 502 (and cases cited therein) ("the defendant's conduct was analogous to the level of disregard for the safety of others and failure to exercise care exhibited by a person merely pointing a gun at another, driving while speeding and weaving, or drawing a loaded gun in a crowded tavern"). The evidence was sufficient to prove defendant guilty beyond a reasonable doubt.

¶ 46                                      Admission of Evidence

¶ 47     Finally, we address defendant's argument the trial court erred in allowing Dr. Narang to testify to "improper hearsay that was not related to L.M.'s medical treatment or diagnosis in contemplation of treatment." Defendant has based his entire argument on Illinois Rule of Evidence 803(4) (eff. Sep. 28, 2018) which reads, in pertinent part, as follows:

> "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> * * *
>
> (4) (A) Statements made for purposes of medical treatment, or medical diagnosis in contemplation of treatment, and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or

treatment but, subject to Rule 703, not including statements made to a health care provider consulted solely for the purpose of preparing for litigation or obtaining testimony for trial, *** statements made by the victim to medical personnel for purposes of medical diagnoses or treatment including descriptions of the cause of symptoms, pain or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Ill. R. Evid. 803 (eff. Sep. 28, 2018).

¶ 48    Defendant propounds the trial court erred in permitting Dr. Narang to testify that Edwards told him "in a laughing manner" that L.M. urinated on her and that Edwards did not appear to be frustrated by that occurrence, and that before she left the bedroom after waking at 3:00 a.m. L.M. was "whining, but not crying like in pain. *** But that was the basis of her rushing back into the room in hearing something that was clearly distinctly different." Defendant also complains of Dr. Narang's testimony that Edwards told Dr. Narang that when she took L.M. from defendant and grasped him around the torso L.M. started crying again in a "loud, distinct way." Defendant argues this testimony as to what Edwards told Dr. Narang does not fall within the "medical treatment exception to the rule against hearsay" because "only a small amount of her statements were related to L.M.'s medical treatment." Defendant argues the complained-of testimony did not aid Dr. Narang in diagnosing L.M.'s medical concerns nor help Dr. Narang with L.M.'s treatment. Defendant argues this erroneous admission of evidence unfairly prejudiced him because "it repeated the fact that L.M. cried out while [defendant] changed his diaper." Defendant also argues that, although unpreserved, we should review this error as plain error.

¶ 49 However, defendant has ignored Rule 703, the actual basis cited by the court for the admission of this testimony. Ill. R. Evid. 703 (eff. Jan. 1, 2011). As previously stated, the defense objected to Dr. Narang's testimony regarding what Edwards said to him as "cumulative," but the court ruled as follows:

> "Your objection is sustained in part, overruled in part.
>
> It is not admissible for the truth of the matter asserted. Miss Edwards wasn't asked about what she said to the doctor. She was asked what she said to the state's attorney and what she said to the social worker and the investigating detectives. So it's not 115-10.1. She didn't make any affirmation that she did or did not say these things to Dr. Narang. So it's not admissible either under 115-10.1, nor is any kind of prior consistent statement. It is admissible for the non-hearsay purpose of explaining in part, I presume, the basis of the doctor's opinions, so it would only be accepted for that necessary purpose.
>
> So affirmed in part and overruled in part."

¶ 50 The admission of Dr. Narang's testimony for this limited purpose, which the trial court in this case expressly recognized and clearly stated, was the limited purpose for which it is allowed under Rule 703, which provides as follows:

> "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." Ill. R. Evid. 703 (eff. Jan. 1, 2011).

¶ 51    Later, during its oral ruling delivering the judgment, regarding Edwards' statements about the night of the incident the court noted that some of Edwards' statements were substantive evidence while others were impeachment but "it's important to appreciate that the Court, I should say me, appreciates that there are distinctions amongst those both with respect to how those prior statements of Ms. Edwards are admitted and for what purpose those prior statements can be utilized." During its ruling the court also stated:

> "Although, curiously, the statements to Dr. Narang by Ms. Edwards are not only admissible for purposes of impeaching further Ms. Edwards' testimony, but they're also properly offered as part of the basis of Dr. Narang's opinion testimony, because any statement offered by a person with the insight that Ms. Edwards had to the circumstances with regard to [L.M.'s] injury are clearly of a type reasonably relied upon by experts in Dr. Narang's field and he could rely on those in reaching his expert opinions in this case. So one more reason why this case is particularly interesting."

¶ 52    Indeed, defendant acknowledges in his brief that "the trial court found that Dr. Narang's testimony about what [Edwards] told him was 'admissible for the non-hearsay purpose of explaining in part, I presume, the basis of the doctor's opinions, so it would only be accepted for that necessary purpose." The facts constituting the bases for an expert's opinions, when admitted only to explain those bases, is not hearsay. Thus, "in [*People v. Anderson*, 113 Ill. 2d 1, 11-12 (1986)] the supreme court simply held that the rule against hearsay does not prohibit a defense expert, during direct examination, from disclosing the basis of his opinion by referring to information contained in a report." *People v. Wilson*, 2017 IL App (1st) 143183, ¶ 42. And in *Anderson*, our supreme court wrote:

"Hearsay is an extrajudicial statement offered in court 'to show the truth of the matters asserted.' (*People v. Carpenter*, 28 Ill. 2d 116, 121 (1963)). Although the contents of the reports relied upon by Dr. Katz would clearly be inadmissible if offered for their truth, the defense seeks to allow the expert to disclose the underlying facts and conclusions not for their truth but for the limited purpose of explaining the basis for the expert witness's opinion. For this limited purpose the statements do not constitute hearsay, and can therefore be allowed." *Anderson*, 113 Ill. 2d at 11-12.

This court has similarly found,

"the hearsay rule traditionally prohibits the admission of out-of-court statements where offered as an assertion to show the truth of the matter asserted therein, thus resting for its value upon the credibility of the out-of-court asserter. *People v. Carpenter*, 28 Ill. 2d 116, 121 (1963). See also C. McCormick, Handbook of Evidence § 225 (1954). The rule is not implicated, however, where statements otherwise inadmissible as hearsay are used by experts for the purpose of explaining the bases for their opinions. [Citation.]" *People v. Leach*, 405 Ill. App. 3d 297, 309 (2010).

¶ 53    Dr. Narang testified that a background from the parents is the type of information relied on by experts in the field of child abuse pediatrics and, regardless, defendant has not challenged

the admission of Dr. Narang's testimony pursuant to Rule of Evidence 703[1], under which it clearly was admissible. Defendant's argument must, therefore, fail.

¶ 54                                    CONCLUSION

¶ 55     For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 56     Affirmed.

---

[1]     See *People v. Saterfield*, 2015 IL App (1st) 132355, ¶ 11 ("Petitioner has made no argument regarding the merits of his petition on appeal and has therefore forfeited these issues on appeal. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) ('Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing').").